IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EVERETT TRIPODIS, MARK
WILSON, JANELL PAYNE,
KAKAWANA TATE, ANTONIO
TYLER and QUENTIN BERRY,

Defendants.

CRIMINAL CASE NO.

1:18-CR-00240-TWT-JFK

## ORDER AND REPORT AND RECOMMENDATION

Pending before the court are Defendant Everett Tripodis' motion [Doc. 97] to

dismiss Counts 2-11 and 14-16 of the indictment, motion [Doc. 98] to suppress

evidence, motion [Doc. 100] to dismiss Count 17, motion [Doc. 101] to dismiss

Counts 2-10, motion [Doc. 102] to strike surplusage, motion [Doc. 103] for a bill of

particulars, and motion [Doc. 104] to dismiss Counts 15 and 16.  Also pending before

the court are Defendant Mark Wilson's motion [Doc. 117] to suppress out-of-court

identification, motion [Doc. 118] to sever, motion [Doc. 130] to dismiss Count 17, and

motion [Doc. 131] to dismiss Counts 2-10.[1]  Finally, pending before the court are

---

[1]Defendant Wilson's motions numbered 130 and 131 are adopting Defendant
Tripodis' motions numbered 100 and 101, respectively.

Defendant Tripodis', filing *pro se*, motion [Doc. 187] to compel discovery, motion [Doc. 188] to dismiss Counts 6 and 7, and motion [Doc. 189] to dismiss Count 17.

### Motions to Dismiss Indictment and For Bill of Particulars

Defendant Tripodis contends that Counts 2-11 and 14-16 of the indictment should be dismissed for failure to state an offense [Doc. 97], that Count 17 should be dismissed for lack of venue [Doc. 100], that Counts 2-10 should be dismissed for lack of venue and jurisdiction [Doc. 101] and that Counts 15-16 should be dismissed for multiplicity [Doc. 104]. And primarily in conjunction with the alleged pleading insufficiency in Counts 2-11, Defendant Tripodis seeks a bill of particulars. [Doc. 103]. Defendant Wilson was granted leave to adopt Tripodis' motions to dismiss counts 2-10 and 17 for lack of venue. The motions were docketed at #130 and #131.[2] The Government responded opposing the motions to dismiss and for a bill of particulars with the exception of conceding that, as currently plead, Counts 15 and 16 are multiplitious.[3] [Doc. 161 at 3]. Accordingly, the court recommends granting Defendant Tripodis' motion [Doc. 104] to dismiss Counts 15 and 16 as multiplitious.

[2]However, as the Government points out, Defendant Wilson is only named in Counts 6-9 and 17. [Doc. 1; Doc. 161 at 3 n.1].

[3]The Government stated an intent to supersede the indictment to correct the pleading error but as of this date has not done so.

2

Defendant Tripodis filed reply briefs [Docs. 175, 176, 177] to the remaining motions to dismiss and for a bill of particulars.  Due to the fact that Defendant's reply brief in support of the motion to dismiss Counts 2-11 and 14-16 included grounds for dismissal not presented in the motion to dismiss, the court ordered the Government to file a supplemental response [Doc. 186] addressing the newly raised grounds for dismissal.

## I.    Indictment

A federal grand jury sitting in the Northern District of Georgia returned a seventeen count indictment against Defendants Tripodis and Wilson, along with co-Defendants Payne, Tate, Tyler and Berry on June 26, 2018.  Count 1 charged a conspiracy, in violation of 18 U.S.C. § 371, against all Defendants to commit the federal offenses of "knowingly and unlawfully remov[ing], obliterat[ing], tamper[ing] with, and alter[ing] an identification number for a motor vehicle [("VIN")]," in violation of 18 U.S.C. § 511(a); of "devis[ing] and intend[ing] to devise any scheme or artifice to defraud, and for the purpose of executing such scheme and artifice and attempting to do so, knowingly caus[ing] any matter or thing to be delivered by mail and any private or commercial interstate carrier" or "to be transmitted by means of wire, radio, and television communications in interstate and foreign commerce, any

3

writings, signs, signals, pictures, or sounds," in violation of 18 U.S.C. § 1341 or § 1343; and of "receiv[ing], possess[ing], conceal[ing], stor[ing], barter[ing], sell[ing], and dispos[ing] of any motor vehicle which has crossed a State and United States boundary after being stolen, knowing the same to have been stolen," in violation of 18 U.S.C. § 2313(a).  [Doc. 1 ¶ 1].

As background, the indictment alleges that every motor vehicle, since the 1981 model year, has a unique seventeen-digit VIN providing specific production and other identifying information.  [Id. ¶ 2].  Typically when a vehicle is stolen, the VIN is entered into national data bases making it more difficult for a car thief to subsequently sell the stolen vehicle for lack of a valid title.  Consequently, the car thief needs to obtain a "clean title" that matches the make and model of the stolen vehicle and to alter the VIN on the stolen vehicle to match the VIN on the "clean title."  [Id. ¶ 3].  A car thief utilizes various internet searches for registered vehicles for matches with the stolen vehicle in order to obtain a fraudulent duplicate title, and then the thief replaces the VIN on the stolen vehicle to match the VIN on the duplicate title - known as "cloning."  [Id. ¶ 4].

The indictment further alleges, as part of the manner and means of conducting the charged conspiracy, that "conspirators obtained title information on vehicles on

4

the S.S. website[,] . . . a fee-based, web-based company that provides national motor vehicle registration information, vehicle collision records, driver safety profiles, driving records, and other information" for use primarily by insurers and employers. S.S. offices are in New Mexico, and web-based customers are served by computer servers located in Virginia. "Consequently, every internet inquiry of S.S.'s information on vehicle registrations is conducted via an interstate wire-transmission." [Id. ¶ 5]. Conspirators set up a fraudulent account with S.S. using the name "K.C." with a physical address in Macon, Georgia, an email address of "insurance247inc@gmail.com," and a contact number of 478-258-4927. The contact information was false, and the phone number was assigned to a cell phone Defendant Tripodis possessed on April 26, 2016. The email account was used to search the S.S. website for vehicle registration information between January and September 2016; however, other sources were also used. [Id. ¶¶ 6-8]. Defendant Tripodis used the S.S. website and other sources to obtain vehicle registration information which was then used to obtain fraudulent duplicate vehicle titles from at least Tennessee and Florida. Defendant Tripodis taught Defendant Tate, who then taught Defendant Payne, how to conduct the searches and obtain duplicate titles. [Id. ¶ 9]. Tripodis, Tate and Payne either searched the S.S. website for a similar make and model for vehicles already

5

stolen or would steal vehicles matching vehicle registration information that had been obtained.  [Id. ¶ 10].  If a conspirator lacked access to the S.S. website, Tripodis either sold that conspirator a duplicate title for $3,500-$5,000 or would trade a stolen vehicle for a duplicate title.  [Id. ¶ 11].  Once the conspirators had a fraudulent duplicate title for a stolen vehicle, the VIN plates on the stolen vehicle were changed to match the VIN on the duplicate title in order for the vehicle to be sold and to allow the buyer to register the vehicle using the cloned VIN.  [Id. ¶ 12].

The following overt acts were alleged as part of the charged conspiracy.  On December 20, 2015, Tripodis and Wilson and others unknown stole eight Bentley vehicles from Alpharetta, Georgia, and on January 8, 2016, Tate obtained fraudulent duplicate titles for four of the Bentleys.  On January 12, 2016, in College Park, Georgia, Tripodis abandoned one stolen Bentley, and on April 7, 2016, another stolen 2016 Bentley GT, with a fraudulent cloned VIN based on a fraudulent duplicate Florida title, was recovered in New Orleans.  [Id. ¶ 13].  On February 24, 2016, Tripodis, Wilson and Tate stole a 2010 Audi S4 sedan and a 2015 Audi Q7 SUV in Knoxville, Tennessee, and drove the vehicles to the Northern District of Georgia.  On February 26, 2016, Tripodis used the previously identified email account to search the S.S. website and obtained registration information for another 2010 Audi S4 registered

6

in Tennessee and, on February 29, 2016, using that information, obtained a fraudulent duplicate title and cloned VIN for the stolen 2010 Audi S4.  On May 27, 2016, Wilson was found driving the stolen 2010 Audi S4 with the cloned VIN.  [Id. ¶ 14].

On February 27, 2016, Tripodis and Wilson stole a 2016 white GMC Yukon Denali SUV in Chattanooga, Tennessee, and drove the vehicle to the Northern District of Georgia.  On February 28, 2016, Tripodis used the email account to search the S.S. website and obtained registration information for another 2016 GMC Yukon Denali SUV registered in Maryland and, on March 1, 2016, using that information, obtained a fraudulent duplicate Tennessee title.  On March 3, 2016, Tripodis sent text messages to C.G. offering the stolen Yukon for sale, which was subsequently purchased by R.L. from C.G. on March 11, 2016; and R.L. used the fraudulent duplicate title to register the Yukon in Alabama.  On June 23, 2016, the Yukon, with a cloned VIN from the Maryland Yukon, was recovered.  [Id. ¶ 15].  On March 26, 2016, Tripodis and Berry stole a 2015 Z06 Corvette in the Northern District of Georgia, and on July 5, 2016, Tripodis used the email account to search the S.S. website and obtained registration information for another 2015 Corvette registered in Florida.  On July 7, 2016, using that information, Tate obtained a fraudulent duplicate Florida title using that cloned VIN.  On August 6, 2016, Tyler stated he was planning on selling the stolen Z06 with

7

the fraudulent title for $27,000, and, on August 7, 2016, the stolen Z06, with the cloned VIN, was found in Florida.  [Id. ¶ 16].  Also, on July 5, 2016, Tate traveled to Florida.  On July 6, 2016, using Payne's telephone, Payne and Tripodis, who was in Georgia, spoke with Tate; Tate asked Tripodis for $400 which Tripodis authorized Payne to send; she did so by interstate wire.  [Id.].

And on November 3-6, 2016, Tyler stole a 2016 Dodge 3500 Ram truck in South Carolina, drove the vehicle to the Northern District of Georgia, and then provided the truck to Payne who paid Tyler with fraudulently obtained duplicate titles for two vehicles.  [Id. ¶ 17].  "In sum, during the times relevant to this Indictment, defendants . . . had an agreement to steal vehicles and fraudulently obtain duplicate titles using cloned VINs, and to sell and cause to be sold the stolen vehicles."  [Id. ¶ 18].

With respect to Counts 2-11[4] and Count 14,[5] the indictment alleges as follows. For Counts 2-11, charging wire fraud offenses in violation of 18 U.S.C. § 1343, the background, manner and means and overt acts allegations in Count 1 are re-alleged

[4]Because Defendants are not seeking to dismiss Counts 12 and 13, the court will are not include those counts in the description of the charges in the indictment.

[5]Because Counts 15 and 16 are being dismissed without objection, the court will not include those counts in the description of the charges in the indictment.

and incorporated.  The indictment then generally alleges, beginning on January 19, 2016, and continuing until in July 2017, that identified Defendants, aided and abetted by one another, knowingly devised and intended to devise a scheme and artifice to defraud and transmitted and caused "to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme and artifice," and, on the dates set forth, in the Northern District of Georgia and elsewhere, transmitted the following wire communications in interstate commerce.  [Id. ¶ 20].  Each count then identifies the Defendant or Defendants allegedly involved in the interstate wire communication, the vehicle associated with the wire communication, and the nature of the wire communication.  With the exception of Count 11, involving the July 7, 2016, Western Union wire transfer of $400 from Payne in the Northern District of Georgia, to Tate in Florida [Doc. 1 ¶ 16], in Counts 2-10, the remaining wire communications are alleged to be between one or more Defendant(s) and the S.S. website.  [Id. ¶ 20, Counts 2-11].

For Count 14, charging a mail fraud offense in violation of 18 U.S.C. § 1341, the background, manner and means and overt acts allegations in Count 1 are re-alleged and incorporated.  Count 14 then generally alleges, beginning on September 2016, and

9

continuing until November 2, 2016, but more specifically, on or about October 17, 2016, that Defendants Tripodis, Payne and Tate, aided and abetted by one another, knowingly devised and intended to devise a scheme and artifice to defraud, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, knowingly caused to be delivered by mail, in the Northern District of Georgia and elsewhere, any matter or thing, to wit:  "Tate received in the mail a fraudulently obtained duplicate Florida title for a Mercedes-Benz G Wagon that Payne and Tripodis had applied for, and Tate delivered it to Payne.  Tripodis and Payne then sold it for $3,000."  [Id. ¶¶ 21-22 (emphasis deleted)].

And Count 17, alleging altering or removing a VIN in violation of 18 U.S.C. § 511(a), alleges that, beginning on December 20, 2015, and continuing to April 7, 2016, in the Northern District of Georgia, Defendants Tripodis, Wilson and Tate, aided and abetted by one another, "knowingly remove[d], obliterate[d], tamper[ed] with, and alter[ed] a[ VIN] for a motor vehicle," identified as a VIN on a stolen 2016 Bentley Continental GT V8S convertible, "replacing the authenticate VIN with a fraudulent VIN[.]"  [Id. ¶ 23].

10

## II.    Discussion

### a.    Motions to Dismiss for Lack of Venue and Jurisdiction

Defendants Tripodis and Wilson seek to dismiss Count 17, charging a violation of 18 U.S.C. § 511(a), for lack of venue.  [Docs. 100, 130].  Defendants argue that, although the motor vehicle involved, a 2016 Bentley Continental GT V8S, was stolen in the Northern District of Georgia on December 20, 2015, and recovered, with a cloned - or altered - VIN in New Orleans on April 7, 2016 [Doc. 1 ¶ 13], the indictment does not allege that the act of altering the VIN occurred in the Northern District of Georgia and argue that "the only evidence is that the VINs were altered *no later* than when the Bentley was recovered" and that "[t]here is no evidence whatsoever that the VINs were altered in the Northern District of Georgia." [Doc. 100 at 3-4 (emphasis in original)].    In response, the Government argues that "circumstantial evidence along with the testimony from a cooperating witness proves that the VIN of the 2016 Bentley Continental GT V8S was altered or removed in the Northern District of Georgia" and then outlines that evidence.  [Doc. 161 at 7-8].  In reply, Defendant Tripodis challenges the Government's proffer of the evidence in support of establishing an inference that venue is properly placed in the Northern District of Georgia and makes arguments regarding "[w]hat is likely" to have occurred

with respect to the alteration of the VIN on the stolen motor vehicle.  [Doc. 176].

Defendant's arguments, again, focus on what the Government must prove in order to

establish venue in this District for a violation of § 511.  [Id.].

And Defendants Tripodis and Wilson move to dismiss Counts 2-10, alleging

wire fraud in violation of 18 U.S.C. § 1343, for lack of venue.  [Docs. 101, 131].

Defendants argue that, because "there is no evidence that any wire transmissions . .

. were sent from, or received in, the Northern District of Georgia, venue cannot

properly lie in this district" - specifically, Defendants argue that there "is no evidence

whatsoever that . . . Tripodis accessed the S.S. website from the Northern District of

Georgia."  [Doc. 101 at 2, 4].  In response, the Government contends that "there is

sufficient evidence that venue for the wire fraud counts, and for aiding and abetting

wire fraud, is proper in the Northern District of Georgia" and then provides a proffer

of the evidence to be introduced at trial in support of that argument.  [Doc. 161 at 5-6].

And, in reply, Defendant Tripodis challenges the proffer of proof and the inferences

to be drawn from the evidence cited by the Government and reasserts that the

Government cannot meet its burden at trial to establish venue in the Northern District

of Georgia.  [Doc. 177].  The arguments made by Defendants and the Government

12

misconstrue the issue before this court, that is, whether Counts 2-10 and 17 sufficiently *pled* venue in the Northern District of Georgia.

"It is by now well-settled that venue is an essential element of the government's proof at trial. 'Questions of venue . . . are not to be taken lightly or treated as mere technicalities. . . .'" United States v. Snipes, 611 F.3d 855, 865-66 (11th Cir. 2010) (citation omitted). Rule 18 of the Federal Rules of Criminal Procedure as well as the U.S. Constitution and the Sixth Amendment "'guarantee defendants the right to be tried in the district in which the crime was committed.'" Id. at 866 (citation omitted); and see United States v. Shoss, 523 Fed. Appx. 713, 715 (11th Cir. 2013) (same). "The locality of the crime is 'determined from the nature of the crime alleged and the location of the act or acts constituting it.'" Shoss, 523 Fed. Appx. at 715 (quoting United States v. Cabrales, 118 S. Ct. 1772, 1776 (1998)). However, Defendants improperly attempt to test the facts upon which venue is asserted in the pretrial motions to dismiss. See United States v. Williams, 2010 WL 3488131, at *4 (N.D. Ga. August 2, 2010) ("in ruling on Defendant's motion to dismiss, the Court cannot address Defendant's contentions that the Government is unable to prove venue, nor the Government's contrary argument that it can[;] the Court is limited to determining whether the government's allegation that Defendant committed the offenses in the

13

Northern District of Georgia 'and elsewhere' is sufficient"), report and recommendation adopted at 2010 WL 3488130 (N.D. Ga. August 30, 2010).

The Eleventh Circuit Court of Appeals summarized the law regarding attacks on the sufficiency of an indictment: "By now it has become well-established that '[t]he sufficiency of a criminal indictment is determined from its face.' . . . 'For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.' . . . 'An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute.'" United States v. Sharpe, 438 F.3d 1257, 1263 (11th Cir. 2006) (citations omitted). In this regard, "an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. . . . An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime." United States v. Cole, 755 F.2d 748, 759 (11th Cir. 1985).

In resolving Defendants' pretrial motions to dismiss, the court is not determining whether the Government's evidence is sufficient to find that venue is proper in this District - such a determination is left to the trial jury. See Snipes, 611

14

F.3d at 866 ("a jury must decide whether the venue was proper"); Sharpe, 438 F.3d at 1263 ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes. . . . It is well-settled that 'a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.'") (citations omitted; emphasis in original).  "There is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. . . . The sufficiency of a criminal indictment is determined from its face." United States v. Salman, 378 F.3d 1266, 1268 (11th Cir. 2004).  These considerations apply equally to a facially sufficient indictment, such as returned by the properly constituted grand jury in this case, that pleads that the offenses occurred in the Northern District of Georgia.  See Williams, 2010 WL 3488131, at *4 ("An indictment need not specify the exact location of the offense, but rather must be sufficiently specific to allege that the crime was committed within the jurisdiction of the court.").

In Snipes, the court noted that "the grand jury returned a facially sufficient indictment, with a clear statement of venue."  611 F.3d at 866.  Such an indictment, "if valid on its face, is enough to call for trial of the charge on the merits." Id.  The

court further held that it would not have been appropriate for the court to make a finding on any pretrial consideration of the facts.  Id.; see also United States v. Valencia-Munoz, 2010 WL 4962972, at **2-3 (N.D. Ga. October 26, 2010), report and recommendation adopted at 2010 WL 4965873 (N.D. Ga. December 1, 2010); Williams, 2010 WL 3488131, at **3-4.  The same is true in this case.  Counts 2-10 and 17 allege that the charged offenses occurred "in the Northern District of Georgia and elsewhere[.]"  [Doc. 1 ¶¶ 20, 23].  Venue is sufficiently alleged.  See Williams, 2010 WL 3488131, at *4 (Because the indictment alleges that the offenses occurred within the Northern District of Georgia, "the indictment is properly pleaded.").

Defendants may, of course, after the close of the Government's case, challenge the sufficiency of the evidence offered in support of venue by moving for a judgment of acquittal.  See Valencia-Munoz, 2010 WL 4962972, at *4 (citing Salman, 378 F.3d at 1268).  "The Eleventh Circuit applies the following test in determining whether venue is proper:  'whether, viewing the evidence in the light most favorable to the government and making all reasonable inferences and credibility choices in favor of the jury verdict . . . the Government proved by a preponderance of the evidence' that the crimes occurred in the district in which the defendant was prosecuted."  Williams, 2010 WL 3488131, at **3-4 & n.1 (quoting United States v. Males, 715 F.2d 568, 569

16

(11th Cir. 1983); United States v. White, 611 F.2d 531, 535 (5th Cir. 1980)). Defendants' arguments going to the sufficiency of the evidence are properly addressed at trial.  See Williams, 2010 WL 3488131, at *4 n.1.

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 100 and 130] to dismiss for lack of venue be **DENIED**.

Defendants also contend, relying on many of the same lack of evidence arguments, that Counts 2-10 should be dismissed for lack of jurisdiction, that is, that the evidence is insufficient to establish interstate wire transmissions. [Docs. 100, 130; Doc. 177].  The Government, likewise, responds arguing that the evidence will show interstate wire transmissions.  [Doc. 161 at 6].  Due to the nature of the attack on jurisdiction in this case, the parties' arguments regarding the sufficiency of the evidence does not guide the court's resolution of the motions to dismiss.

Although typically when ruling on a pretrial motion to dismiss a court is limited to a review of the face of the indictment, see Sharpe, 438 F.3d at 1263, "in ruling on a motion to dismiss for lack of jurisdiction, it is sometimes appropriate to go beyond the face of the indictment and consider evidence relevant to jurisdiction." United States v. Galvis-Pena, 2012 WL 425240, at *3 (N.D. Ga. February 9, 2012); and see United States v. Garate-Vergara, 942 F.2d 1543, 1554 (11th Cir. 1993) ("A preliminary

17

question is whether the jurisdictional requirement is an issue to be decided by the trial court or by the jury."). In United States v. McLean, 802 F.3d 1228 (11th Cir. 2015), the Eleventh Circuit Court of Appeals noted that it had "held in a variety of contexts that, when a jurisdictional issue is inextricably entwined with a substantive element of a crime, the issue should be determined at trial by a jury." Id. at 1246 (noting that such "'is clearly the case when the jurisdictional requirement is also a substantive element of the offense charged'") (citation omitted); and see United States v. Gonzalez, 540 Fed. Appx. 967, 979 (11th Cir. 2014) (noting that the court had "typically construed attacks on jurisdictional elements as a challenge to the sufficiency of the evidence supporting that particular jurisdictional element"). "Thus, a jurisdictional defense that is 'intermeshed with questions going to the merits' of the case should not be determined by a pretrial motion. . . . Indeed, such questions are for the jury to decide." Galvis-Pena, 2012 WL 425240, at *3.

Defendants argue that "it is an essential element that the government prove that . . . Tripodis [and/or Wilson] transmitted or caused to be transmitted by wire some communication in interstate commerce to help carry out the scheme to defraud" and that, without such evidence, "there is no jurisdiction for the offense[s]" charged in Counts 2-10. [Doc. 101 at 4]. "The elements of wire fraud under 18 U.S.C. § 1343

are (1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the scheme." United States v. Hasson, 333 F.3d 1264, 1270 (11th Cir. 2003). Counts 2-10 allege that one or more Defendants, aided and abetted by one another, knowingly devised and intended to devise a scheme and artifice to defraud and *transmitted and caused* "to be *transmitted by means of wire, radio, and television communication in interstate and foreign commerce*, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme and artifice," and, on the dates set forth, in the Northern District of Georgia and elsewhere, *transmitted the following wire communications in interstate commerce,* identifying each alleged interstate wire transmission charged. [Doc. 1 ¶ 20 (emphasis added)]. The indictment sufficiently pleads the jurisdictional element as required. The court finds that Defendants' attack on the jurisdictional element of § 1343 falls within the circumstances identified by the court in McLean and concludes that the "jurisdictional issue [before this court] is inextricably entwined with a substantive element of [§ 1343; accordingly,] the issue should be determined at trial by a jury." 802 F.3d at 1246. Of course, Defendants may renew their challenge to the court's jurisdiction over the wire fraud charges at the close of the evidence. See United States v. Greer, 956 F. Supp. 531, 536 (D. Vt. 1997) (noting that the defense and prosecution were not

"in agreement over the facts alleged that would support nexus[,]" the court concluded that the jurisdiction issue constituted "a factual as well as a legal element of the crime . . . present[ing] an issue for jury determination" and denied the motion to dismiss "but recognize[d] that the defendants may challenge the sufficiency of the evidence of nexus presented at trial").

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 100 and 130] to dismiss for lack of jurisdiction be **DENIED**.

### b.     Defendant Tripodis' Motion to Dismiss for Failure to State an Offense

Defendant Tripodis also seeks to dismiss Counts 2-11, alleging wire fraud in violation of 18 U.S.C. § 1343, and Count 14, alleging mail fraud in violation of 18 U.S.C. § 1341.[6]  [Doc. 97].  In Defendant's operative motion, he argued that these counts of the indictment were insufficiently plead because they did not include every element of each offense, that is, that the victims of the alleged fraud were not identified, that the property that is the subject of the fraud was not identified, and that the material misrepresentations were not identified. [Id.].  The Government responded

---

[6]As noted *supra*, because the Government is not opposing dismissal of Counts 15 and 16, also alleging mail fraud violations, the court is only addressing Defendant's motion as to Count 14.

20

contending that the indictment did set forth the elements of the wire fraud and mail fraud statutes and informed Defendant of the charges against him, especially when considering the incorporated information set out in the background, manner and means and overt act paragraphs of the conspiracy alleged in Count 1. The Government also argues that identification of the victims of the alleged fraud in the indictment is not required. [Doc. 161 at 9-14]. In reply, Defendant countered the Government's arguments regarding the elements of the offense by arguing that wire fraud and mail fraud convictions require "proof" that a victim is defrauded of money or property but that the indictment does not allege either "essential element." [Doc. 175 at 4]. Defendant also objects to the incorporation by reference of the background, manner and means and overt acts paragraphs of Count 1 and argues that these paragraphs do not "reliably and sufficiently describe or charge mail or wire fraud" and may contribute to a jury verdict that is not unanimous. [Id. at 4-5, 11-12]. Defendant further expands his challenge to the mail and wire fraud counts by arguing that the indictment fails to notify him of the charges against him, again focusing on the lack of specificity as to the victim(s) of the fraud and the property interests being defrauded. Defendant argues that he cannot defend against the charges because, as plead, there may be multiple victims for each count and various property interests

21

arguably harmed.[7]  [Id. at 7-10]. Defendant questions whether the vehicles identified are the "property" allegedly being defrauded.  Then he goes on to argue, if that is the case, the stolen vehicles cannot satisfy the "property element" of the fraud charges.[8] [Id. at 8, 14-20].  And, again, because the Government has not identified the victim(s) and the property for each wire and mail fraud count in the indictment, Defendant argues that he is not protected against being tried again for the same conduct and cannot be guaranteed an unanimous verdict.  [Id. at 10–12].

In the supplemental brief, the Government responds that Defendant's argument that incorporation of the background, manner and means and overt acts of Count 1

---

[7]Throughout this part of his reply, Defendant's arguments in support of a bill of particulars overlap his sufficiency of the indictment challenge.  Defendant seeks additional information regarding "whether the table of listed vehicles identified vehicles with cloned VINs, vehicles related to fraudulent title certificates, or simply vehicles that were the subjects of internet searches. . .[; therefore, Defendant argues that] it is impossible to determine with any certainty whether the vehicles . . . were actually stolen, had their VINs altered or removed, or even existed in the first place." [Id. at 7].

[8]Defendant also presents a lengthy argument regarding hypothetical "victims" and "property" interests, including whether the alleged victims might be one of the States from which the duplicate titles, that is, the property, were obtained and, also, whether the wires or mails were, then, even used in furtherance of the scheme to defraud.  [Id. at 14-20].  Based on the Government's supplemental response regarding the potential victim(s) of the fraudulent scheme and the property interests defrauded [Doc. 186 at 8-11], the court will not address Defendant's hypothetical arguments which are not at issue in this case.

22

(which outlines the scheme to defraud) fails to state claims for wire and mail fraud ignores the language tracking the statutory elements and the information identifying Defendants charged, vehicles involved and wire or mailing set forth in Counts 2 through 14. [Doc. 186 at 3-6]. With respect to Defendant's double jeopardy and lack of unanimous verdict arguments, the Government points out that Defendant is simply repeating his contention that the indictment does not identify the alleged victims or property involved, that he fails to offer any legal authority in support, and that he improperly conflates the issue of sufficiency of the indictment with the issue of the jury instructions required to assure unanimous jury verdicts. [Id. at 6-8]. The Government responds to Defendant's argument that the stolen vehicles cannot be the "property" that the victims are being deprived of by identifying both the property interests at issue and the potential victims of the scheme to defraud as follows.

> [T]he Government notes from the outset that each count of fraud was part of Defendant Tripodis' overall scheme that involved multiple property interests and harm to multiple victims. The purchasers and prospective purchasers of the stolen vehicles were deprived of their money in exchange for fraudulently registered vehicles. Vehicle owners were deprived of their intangible right to clean vehicle registration. The S.S. website was deprived of its services through Defendant's and codefendants' use of false information.
>
> [Defendant] is not charged [in the fraud counts] with stealing vehicles and then reselling them as quickly as possible. Instead, his scheme

23

> involved fraudulently obtaining titles of cars that were similar to the ones that he and his codefendants had stolen, all by using the Internet and the mail.  This title would accompany the stolen car as proof that the purchaser had legally acquired the vehicle (or so he believed). Fraudulently obtaining a title from Tennessee or Florida deprived not the state but the vehicle owner of a clean title . . . .

[Id. at 9-10].

After consideration of the arguments of the Government and Defendant, the court recommends that the motion to dismiss be denied.

As set forth *supra*, "'[t]he sufficiency of a criminal indictment is determined from its face.' . . . 'For an indictment to be valid, it must contain the elements of the offense intended to be charged, and sufficiently apprise the defendant of what he must be prepared to meet.' . . . 'An indictment not framed to apprise the defendant with reasonable certainty, of the nature of the accusation against him is defective, although it may follow the language of the statute.'" Sharpe, 438 F.3d at 1263 (citations omitted).  Therefore, "an indictment must be sufficiently specific to inform the defendant of the charge against him and to enable him to plead double jeopardy in any future prosecution for the same offense. . . .  An indictment satisfies these requirements as long as the language therein sets forth the essential elements of the crime." Cole, 755 F.2d at 759.  Because of a number of Defendant's arguments in

24

support of his motion to dismiss focuses on the "proof" that may or may not be offered at trial and involves discussions not properly before the court at this stage of the proceedings, the court reiterates that "[t]here is no summary judgment procedure in criminal cases.  Nor do the rules provide for a pre-trial determination of sufficiency of the evidence. . . ." Salman, 378 F.3d at 1268; and see Sharpe, 438 F.3d at 1263 ("In ruling on a motion to dismiss for failure to state an offense, a district court is limited to reviewing the *face* of the indictment and, more specifically, the *language used* to charge the crimes. . . .  It is well-settled that 'a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial.'") (citations omitted; emphasis in original).  The court will not address arguments going to the Government's probable proof at trial.

Defendant primarily argues that the mail and wire fraud counts in the indictment are insufficiently plead and results in his inability to plead double jeopardy and obtain unanimous jury verdicts on the substantive wire and mail fraud counts because the identities of the victims are not set forth, the property that was the subject of the fraud is not specified and the alleged material misrepresentations are not stated.  Again, "[t]he elements of wire fraud under 18 U.S.C. § 1343 are (1) intentional participation in a scheme to defraud and (2) use of the interstate wires in furtherance of the

25

scheme." Hasson, 333 F.3d at 1270.  Likewise, the "mail fraud statute, 18 U.S.C. § 1341, prohibits the use of the mails [in lieu of interstate wires] in furtherance of a scheme to defraud." United States v. Lee, 427 F.3d 881, 887 (11th Cir. 2005).  The essential elements of both types of fraud are sufficiently plead in the indictment especially when considered in light of the allegations incorporated by reference from the background, manner and means and overt acts of the conspiracy count.

The court will detour for a moment to address Defendant's challenge, which relies in large part on the decision in United States v. Bobo, 344 F.3d 1076 (11th Cir. 2003), to the incorporation by reference in Counts 2 - 11 and 14, and the reasons those challenges lack merit.  [Doc. 175 at 4-510-12].  The decision in Bobo is distinguishable.  First, the charges in Bobo fall under 18 U.S.C. § 1347, alleging health care fraud, with the specific pleading requirements for that statute which are not found in the wire and mail fraud statutes.  See Bobo, 344 F.3d at 1084.  Additionally, unlike the indictment in Bobo, in the indictment before this court, summarized *supra*, the Government did not rely solely on the manner and means and overt acts paragraphs of the conspiracy charge to plead the claims for wire and mail fraud but, instead, further alleged conduct tracking the statutory elements of the offenses.  See id. Also, unlike the indictment under consideration in Bobo, the indictment in this

26

case, relying in part on the incorporated paragraphs, does allege the specific conduct undertaken by Defendant Tripodis and his co-Defendants which constituted the scheme to defraud.  See id.  These are the same distinguishing factors relied on by the court in United States v. Bobo, 2007 WL 962976, at **3-4 (N.D. Ga. February 16, 2007), report and recommendation adopted by 2007 WL 9676896 (March 23, 2007), to find that the Eleventh Circuit decision was not controlling in resolving these issues. The magistrate judge in Bobo also rejected the defendant's argument that incorporating by reference paragraphs in the conspiracy count "are insufficient to describe 'the essential facts' of each substantive count's fraud element."  Id., at *5. The judge stated, "Incorporation by reference is explicitly permitted by Rule 7(c)(1) of the [Fed. R. Cr. P.] . . . .  Thus, the mere incorporation by reference of allegations elsewhere in the Indictment does not render the substantive counts invalid."  Id.  The judge further distinguished the reasoning of the Eleventh Circuit in Bobo, which held that the indictment "did not clarify how Dr. Bobo's acts were unlawful[,]" id., at *6 (citing Bobo, 344 F.3d at 1084), and the same distinguishing factors apply to the indictment before this court.  The reason incorporating by reference the manner and means and overt acts in Bobo into the alleged health care fraud counts was insufficient was due to the fact the "overt acts listed in the conspiracy charge failed to show how

27

Dr. Bobo's conspiracy was in furtherance of an illegal objective." Bobo, 2007 WL 962976, at *6 (citing Bobo, 344 F.3d at 1085).  No such shortcoming is present in this case.   In fact, Defendant Tripodis' scheme to defraud is clearly set forth in the "background" and "manner and means" paragraphs of the conspiracy charge without reliance on the overt acts.  [Doc. 1 ¶¶ 3-12].

Finally, the decision in United States v. Adkinson, 135 F.3d 1363 (11th Cir. 1998), relied on by the court in Bobo for the proposition that "overt acts are to support the charge of conspiracy, 'not to describe an alleged scheme to defraud[,]'" 344 F.3d at 1085 (citation omitted), is likewise distinguishable.  In Adkinson, the part of the conspiracy charge alleging bank fraud and the paragraphs in support of a bank fraud scheme had been dismissed leaving the substantive bank fraud counts "with no scheme to be incorporated by reference" into the substantive fraud counts.  135 F.3d at 1376.   And the court found that the remaining overt acts failed to describe a coherent bank fraud scheme and did not, standing alone, "supply the missing allegations of a scheme or artifice to defraud the banks."  Id. at 1377.  This fact, not at issue herein, also resulted in the court's finding regarding lack of jury unanimity. Id.  The court stated, "[E]ven if the overt acts could supply the missing 'scheme,' the jury, *having no description of a bank fraud scheme*, was left free to pick and choose

28

that 'scheme' from wherever they wished among the 227 overt acts.  Under *such circumstances*, the probability that the resulting verdict was not unanimous would be overwhelming."  Id. (emphasis added).  Such fears are not well-taken in the case before this court given the specific allegations stating the scheme to defraud, set forth *infra*, and the additional language in each substantive count in the indictment in this case.  That fact also distinguishes this case from the concerns identified by the Eleventh Circuit in Bobo regarding the jury having to rely solely on the overt acts in the conspiracy count to identify the health care fraud scheme - not elsewhere alleged - and the possible lack of jury unanimity.  Bobo, 344 F.3d at 1085 ("The failure of the jury to unanimously agree on which overt act *constitutes the 'scheme'* deprives Dr. Bobo of the right to a unanimous verdict.") (emphasis added).  The jury herein need not rely on the overt acts to agree upon the scheme to defraud.  Neither the court in Bobo or in Adkinson foreclosed, otherwise, incorporating by reference paragraphs from a conspiracy charge into substantive counts or expressed that doing so would raise concerns of lack of jury unanimity.  Accordingly, the decisions relied on by Defendant are distinguishable and do not support dismissal of the mail and wire fraud counts in this indictment.

29

The scheme outlined in the indictment is straightforward and involves Defendant Tripodis and one or more of his co-Defendants stealing luxury automobiles from car dealerships in Georgia and elsewhere, such as Tennessee, and then, via the S.S. website, using the fraudulently established account, locating vehicles matching the stolen vehicles in order to obtain fraudulent duplicate titles from the State of Florida or the State of Tennessee (which deprives the true owners of the vehicles in question of their property, a clean title) and, using that fraudulently obtained duplicate title, then altering the VINs on the stolen vehicle - "cloning a VIN" - in order to allow subsequent purchasers or owners of the stolen vehicles to register the stolen vehicles (which provides Defendants with fraudulently obtained funds from the purchasers and deprives the purchaser of his funds and a true clean title to the vehicle).[9] [Doc. 1 ¶¶ 3-12; Doc. 186 at 9-10]. The substantive counts of the indictment, then allege, beginning on January 19, 2016, and continuing until in July 2017, that identified Defendants, aided and abetted by one another, knowingly devised and intended to devise a scheme and artifice to defraud and transmitted and caused "to be transmitted

---

[9]The court is well-aware that Defendant contends that there were no innocent purchasers of the stolen vehicles with the cloned VINs. [Doc. 175 at 1-2]. However, the court is not resolving factual disputes or considering evidence that may or may not be introduced at trial at this stage of the proceedings.

by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, or sounds for the purpose of executing such scheme and artifice," and, on the dates set forth, in the Northern District of Georgia and elsewhere, transmitted the following wire communications in interstate commerce.  Each count identifies the Defendant or Defendants allegedly involved in the interstate wire communication, the vehicle associated with the wire communication, and the nature of the wire communication.  With the exception of Count 11, involving the July 7, 2016, Western Union wire transfer of $400 from Payne in the Northern District of Georgia, to Tate in Florida [Doc. 1 ¶ 16], in Counts 2-10, the remaining wire communications are alleged to be between one or more Defendant(s) and the S.S. website, in order to obtain information regarding vehicles for which duplicate title certificates could be obtained in furtherance of the scheme. [Id. ¶ 20, Counts 2-11].  And for the mail fraud count, Count 14 alleges, beginning in September 2016, and continuing until November 2, 2016, but more specifically, on or about October 17, 2016, that Defendants Tripodis, Payne and Tate, aided and abetted by one another, knowingly devised and intended to devise a scheme and artifice to defraud, and for the purpose of executing the scheme and artifice to defraud and attempting to do so, knowingly caused to be delivered by mail, in the Northern District

31

of Georgia and elsewhere, any matter or thing, to wit: "Tate received in the mail a fraudulently obtained duplicate Florida title for a Mercedes-Benz G Wagon that Payne and Tripodis had applied for, and Tate delivered it to Payne. Tripodis and Payne then sold it for $3,000." [Id. ¶¶ 21-22 (emphasis deleted)].

There is one scheme to defraud in the indictment. And there are, at issue, eleven identified, specific wire transmissions and one identified, specific mailing in furtherance of the scheme pertaining to identified stolen vehicles with which Defendant is charged. He can plead double jeopardy, and the language charging the conduct at issue (especially given the court's order on the bill of particulars) protects his due process rights to place him on notice of the offenses against which he must defend at trial. Any other issues that Defendant raises regarding materiality, jury unanimity and how the Government will prove the mail and wire fraud charges at trial are misplaced at this stage of the proceedings. See United States v. Detling, 2019 WL 3006623, **5-6 (N.D. Ga. April 30, 2019) (the defendant's arguments in the motion to dismiss concerning proof of the terms of the agreement at the heart of the scheme to defraud and whether the victims received bargained-for property, including whether the misrepresentations were material, involve questions of fact to be resolved by the jury at trial), report and recommendation adopted by 2019 WL 2284726 (N.D. Ga.

AO 72A
(Rev.8/82)

May 29, 2019); United States v. Denunzio, 2015 WL 5305226, at *5 (D. Mass. September 9, 2015) ("the ultimate determination of the materiality of defendants' purported misrepresentations is for the jury to determine after hearing all of the evidence during trial"); Bobo, 2007 WL 962976, at *7 (rejecting the defendant's argument "that the indictment does not give 'extensive detail and description' about his alleged illegal acts" because "[a]n indictment need not give extensive details in order to be valid under the Sixth Amendment and Rule 7(c)(1); it must only allege the 'essential elements' of each charged offense and the 'essential facts' demonstrating those elements") (citation omitted).

And, frankly, Defendant is well aware that a motion to dismiss an indictment (alleging the same deficiencies as he asserts in this case) charging mail fraud counts, plead substantially as the wire and mail fraud counts are plead in this case, for essentially the same scheme to defraud, lacks merit. The charges in United States v. Tripodis, 2006 WL 8429620 (N.D. Ga. October 16, 2006), alleged that Defendant Tripodis violated the mail fraud statute involving "a scheme in which Defendant allegedly applied for and obtained via the mails eight duplicate motor vehicle title certificates, which he then allegedly used for two purposes. First, Defendant used the duplicate title certificates to apply for Georgia titles to the vehicles listed on the title

33

certificates.  Second, Defendant used the VINs on the duplicate title certificates to obtain stolen vehicles of the same make and model and to alter the VINs on the stolen vehicles to match the VINs of the vehicles to which the title certificates corresponded." Id., at *5.  Noting that a "scheme to defraud" requires "property that is the subject of the fraud[,]" the court found that "there must also be a victim of each scheme to defraud, a person from whom the property has or will be taken." Id., at *4. However, the court noted that "the victim of the scheme to defraud does not have to be the recipient of the items mailed as part of the scheme" and "does not need to have actually been defrauded in order for mail fraud to have occurred." Id.; and see United States v. Aossey, 2015 WL 5050276, at **9-10 (N.D. Iowa August 25, 2015) ("It does not matter if 'the entity deceived was not the ultimate victim of the scheme that was deprived of money or property.'") (citation omitted); United States v. Singhal, 876 F. Supp. 2d 82, 100 (D. D.C. 2012) ("An indictment charging mail fraud is not required to allege actual monetary loss. . . .  [I]t is not necessary even to show that a loss took place.") (citation and internal quotation marks omitted).  The court in Tripodis found that the "property that is the subject of this alleged scheme is . . . the money Defendant would have obtained upon sale of the stolen vehicles had the scheme been successful" and that the "victim of this alleged scheme is . . . the innocent customer who would

34

have naively purchased the VIN-altered vehicles from Defendant had the scheme been

successful."[10]   Tripodis, 2006 WL 8429620 at *5.   The court in the previous case

found that Defendant Tripodis was "fully aware, from the face of the indictment, that

he is being charged with 1) a scheme to defraud and 2) eleven mailings in furtherance

of the scheme."  Id., at *8.   The same conclusion holds true in this case.

---

[10]Just as the Government contends in this case, in the first Tripodis case, the Government argued that the victims of the fraud scheme were, not the states where the duplicate titles were obtained, but "the 'actual owners' of the original motor vehicle titles . . . [because] the original motor vehicle titles constitute property in the hands of the actual owners."  Id., at *3.  The indictment in that case, in fact, identified the actual title owners, not the subsequent purchasers - or intended purchasers - of the stolen vehicles with the altered VINs, in the indictment.  Id., at *6.  Although the court in Tripodis identified the purchasers of the stolen vehicles as the victims and the money fraudulently obtained by Defendants as the property (one of the alternatives offered by the Government in this case [Doc. 186 at 9-10]), the court finds the Government's argument persuasive, that is, the actual title owners and their property interest in a clean title to their vehicles may also satisfy both the property interest involved and the victim of the fraud.  See United States v. Zhang, 2017 WL 4236614, at *3 (S.D. Ind. September 25, 2017) (the court rejected the defendant's argument that the fraudulent scheme involving the issuance of prescriptions based on the defendant's lies to the issuing physician did not sufficiently allege a victim, besides the state, or a property interest, besides regulatory, but found that the prescriptions allowed the holder to obtain that which he otherwise could not and that, "although a license itself may not be property . . ., it does not follow that the privileges conveyed by that license are not property, particularly when the alleged victim is the license holder rather than the license grantor"); United States v. Finazzo, 2014 WL 184134, at *2 (E.D. N.Y. January 14, 2014) (noting "the well-established proposition that the interest of a victim in controlling his or her own assets is a property[ ] interest protected by the mail and wire fraud statutes") (citations and internal quotation marks omitted).

35

And contrary to Defendant's argument that a victim must be identified in the indictment and that failure to do so violates his due process rights to notice, the court finds that, while the Government is required to prove the existence of a victim at trial, the wire and mail fraud statutes do not "'include an element requiring a contemplated harm to a specific, identifiable victim'" and that "specific victims need not be identified" to satisfy "the particularity of the indictment[.]" United States v. Howard, 619 F.3d 723, 727 (7th Cir. 2010) (citation omitted); and see United States v. Jones, 2019 WL 5092110, at *8 (W.D. Tenn. August 8, 2019) ("The identity of the alleged victim is not an essential element of the offense of wire fraud."); Singhal, 876 F. Supp. 2d at 100 ("victims of the fraud need not be identified in the Indictment"); United States v. Faulkner, 2011 WL 2880919, at *2 (N.D. Tex. July 15, 2011) ("'Although the offense of wire fraud requires a victim, the victim need not be named in the indictment' . . . because '[t]he focus of the mail [and wire fraud] statute[s are] upon the use of the mail [or wires] to further a scheme to defraud, not upon any particular kind of victim.'") (quoting, inter alia, United States v. Hatch, 926 F.2d 387, 392 (5th Cir. 1991) ("affirming denial of defendant's motion to dismiss where defendant argued that failure to identify proper legal victim violated his due process rights by hindering his ability to prepare defense")); United States v. Reddy, 2010 WL

36

3210842, at *19 & n.9 (N.D. Ga. April 5, 2010) (in a mail fraud case, finding "that the indictment is not fatal for not describing who were the victims of the defendant's scheme" because "'mail fraud [and likewise wire fraud] does not include an element requiring a contemplated harm to a specific, identifiable victim'") (citation omitted), report and recommendation adopted as modified 2010 WL 3211029 (N.D. Ga. August 11, 2010).

For these reasons, the court **RECOMMENDS** that Defendant Tripodis' motion [Doc. 97] to dismiss for insufficiency of Counts 2-11 and 14 be **DENIED**.

### c.    Defendant Tripodis' Bill of Particulars

In the request for a bill of particulars with respect to the mail and wire fraud counts, Defendant Tripodis seeks the identity of the alleged victim(s) of the scheme to defraud and of the property they were allegedly deprived of because each are essential elements of the offense.  [Doc. 103 at 2].  Defendant also requests that the Government specify with respect to the motor vehicles identified by a VIN in the fraud counts "whether those vehicles are stolen cars, cloned VINs, or simply the subjects of internet searches." [Id.].  Defendant also claims that he "has not been informed of the specific material misrepresentations, or the omissions or concealments of material facts calculated to deceive another out of money or property." [Id. at 5].  And, with

37

respect to the Count 17, alleging altering or removing a VIN in violation of 18 U.S.C. § 511(a), Defendant requests that the Government identify the motor vehicle at issue. [Id. at 3]. In response, the Government asserts that a bill of particulars is not necessary but primarily makes arguments based on generic case law besides pointing out that the indictment alleges the essential elements and facts and that, in addition, the Government produced in discovery over thirteen thousand documents. [Doc. 14-18]. In reply, Defendant reiterates that the indictment does not identify the victims, property or material misrepresentations for the fraud counts and does not identify the vehicle in Count 17 and then presents his arguments, addressed *supra*, why the indictment fails to sufficiently allege mail and wire fraud. [Doc. 175].

"The purpose of a bill of particulars is to inform the defendant of the charge against him with sufficient precision to allow him to prepare his defense, to minimize surprise at trial, and to enable him to plead double jeopardy in the event of a later prosecution for the same offense." United States v. Warren, 772 F.2d 827, 837 (11th Cir. 1985); see also United States v. Hassoun, 477 F. Supp. 2d 1210, 1227-28 (S.D. Fla. 2007) ("A request for bill of particulars is, *inter alia*, befitting in those instances where defendant seeks further clarity and precision with regard to the charges that he is facing in order to adequately prepare a defense."). "Generalized discovery is not

38

the proper function of a bill of particulars." Warren, 772 F.2d at 837 (citing United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981)); see also United States v. Roberts, 174 Fed. Appx. 475, 477 (11th Cir. 2006) (same). Likewise, a defendant may not use a bill of particulars "to acquire 'information which is already available through other sources'" such as discovery. United States v. Holzendorf, 576 Fed. Appx. 932, 935 (11th Cir. 2014) (citation omitted). While the court "is vested with broad discretion in deciding whether a bill of particulars should be granted[,]" United States v. Cole, 755 F.2d 748, 760 (11th Cir. 1985), "'where an indictment fails to set forth specific facts in support of requisite elements of the charged offense, and the information is essential to the defense, failure to grant a request . . . may constitute reversible error[,]'" Id. (quoting United States v. Crippen, 579 F.2d 340, 349 (5th Cir. 1978)). This court has found that the wire and mail fraud charges, which are set out in detail *supra*, sufficiently allege those charges by stating the elements of the offense charged therein and by providing details regarding the manner and means - or the scheme to defraud - by which Defendant participated in the charged crimes and Defendant's request for additional information regarding these charges will be discussed *infra*, after the court addresses Defendant's request for the identity of the VIN for the motor vehicle in Count 17. [Doc. 103 at 5-6].

39

Count 17 alleges that, beginning on December 20, 2015, and continuing to April 7, 2016, in the Northern District of Georgia, Defendants Tripodis, Wilson and Tate, aided and abetted by one another, "knowingly remove[d], obliterate[d], tamper[ed] with, and alter[ed] a[ VIN] for a motor vehicle," identified as a VIN on a stolen 2016 Bentley Continental GT V8S convertible, "replacing the authentic VIN with a fraudulent VIN[.]" [Doc. 1 ¶ 23].  The VINs allegedly replaced and/or altered are not alleged.  [Id.].  Defendant seeks disclosure of the authentic VIN that was on the stolen 2016 Bentley Continental GT V8S that was replaced and the disclosure of the fraudulent VIN then placed on that vehicle.  Defendant points out that, although the Government provided voluminous discovery, the "discovery was heavily redacted and contained few VINs that were legible."  [Doc. 175 at 20].  After consideration of the request and the Government's lack of a specific response addressing this request [Doc. 161 at 8-11], the court **ORDERS** the Government to provide Defendant with the "authentic" VIN and the "fraudulent" VIN for the 2016 Bentley Continental GT V8S convertible referenced in Count 17.

With respect to the allegations in the wire and mail fraud counts, as noted, Defendant seeks the identities of the victims and of the property that was the subject of the fraudulent scheme.  The court finds that Defendant has sufficient information

to prepare for trial.  Besides the allegations in the indictment, in the supplemental

response to the motion to dismiss these counts, the Government further identified the

categories of potential victims and the nature of the property at issue:

> [T]he Government notes from the outset that each count of fraud was part
> of Defendant Tripodis' overall scheme that involved multiple property
> interests and harm to multiple victims.  The purchasers and prospective
> purchasers of the stolen vehicles were deprived of their money in
> exchange for fraudulently registered vehicles.  Vehicle owners were
> deprived of their intangible right to clean vehicle registration.  The S.S.
> website was deprived of its services through Defendant's and
> codefendants' use of false information.
>
> [Defendant] is not charged [in the fraud counts] with stealing vehicles
> and then reselling them as quickly as possible.  Instead, his scheme
> involved fraudulently obtaining titles of cars that were similar to the ones
> that he and his codefendants had stolen, all by using the Internet and the
> mail.  This title would accompany the stolen car as proof that the
> purchaser had legally acquired the vehicle (or so he believed).
> Fraudulently obtaining a title from Tennessee or Florida deprived not the
> state but the vehicle owner of a clean title . . . .

[Doc. 186 at 9-10].  Additionally, as stated previously, "'[a]lthough the offense of wire

fraud requires a victim, the victim need not be named in the indictment' . . . because

'[t]he focus of the mail [and wire fraud] statute[s are] upon the use of the mail [or

wires] to further a scheme to defraud, not upon any particular kind of victim.'"

Faulkner, 2011 WL 2880919, at *2 (citation omitted); and see Jones, 2019 WL

5092110, at *8 ("The identity of the alleged victim is not an essential element of the offense of wire fraud."); Singhal, 876 F. Supp. 2d at 100 ("victims of the fraud need not be identified in the Indictment"); Reddy, 2010 WL 3210842, at *19 & n.9 (in a mail fraud case, finding "that the indictment is not fatal for not describing who were the victims of the defendant's scheme" because "'mail fraud [and likewise wire fraud] does not include an element requiring a contemplated harm to a specific, identifiable victim'") (citation omitted).  And, as noted, although a "scheme to defraud" requires "property that is the subject of the fraud[,]" there is no requirement to prove that anyone was "actually . . . defrauded in order for mail fraud to have occurred." Tripodis, 2006 WL 8429620, at *4; and see Singhal, 876 F. Supp. 2d at 100 (D.C. 2012) ("An indictment charging mail fraud is not required to allege actual monetary loss. . . .  [I]t is not necessary to even to show that a loss took place.").  Defendant is not entitled to pretrial disclosure of information, that is, the specific property interests of specific, identified victims who were allegedly defrauded, when such proof is not required at trial.  See Howard, 619 F.3d at 727 (mail and wire fraud "'does not include

42

an element requiring contemplated harm to a specific, identifiable victim'") (citation omitted).[11]

The court also finds that Defendant's request for the specific material misrepresentation and/or omissions made by Defendant in furtherance of the scheme to defraud seeks evidentiary detail - in light of the information already set forth in the indictment specifying the nature of the fraudulent misrepresentations to obtain the duplicate certificates of title - that is not appropriate in a bill of particulars.[12]  See Holzendorf, 576 Fed. Appx. at 935-36 (finding that the defendant's request for "every single material misrepresentation . . . was nothing more than a thinly veiled attempt to have the government make a detailed disclosure of the evidence that it planned to

---

[11]In Howard, the government had identified victims in the indictment but did not prove at trial "an intent to harm those named victims." Id.  The court held, "It is sufficient that the government in this case proved that Howard intended to defraud the scheme's victims, whomever they were, and such intent was established by examining the circumstances of the scheme itself, not by who was specifically named in the indictment." Id.

[12]Defendant's motions make it clear that he is well-aware of the nature of the scheme to defraud and the underlying misrepresentations when he provides a description of the scheme. [Docs. 103 at 1-2; 175 at 1-2].  Responding to Defendant's claim that the indictment does not identify the alleged misrepresentations, the Government also points out that the indictment alleges that Defendant "Tripodis created a fraudulent profile with a false name and address in order to gain access to the S.S. website and used this information to prepare fraudulent power-of-attorney forms in order to obtain duplicate vehicle titles." [Doc. 161 at 13-14].

AO 72A
(Rev.8/82)

present at trial" which "is not an appropriate basis for seeking a bill of particulars");

United States v. Welch, 198 F.R.D. 545, 552 (D. Utah 2001) ("As to matters in the

nature of misrepresentations and concealments, the defendants are not entitled to the

particular specifics . . . as these are matters of evidence.  The general methods are

otherwise set out.   Since some of the methods and the substance of the

misrepresentations and concealments is provided in the indictment, a bill is not

required."); accord Roberts, 174 Fed. Appx. at 477 (a bill of particulars "'is not

designed to compel the government to [provide] detailed exposition of its evidence'")

(citation omitted); United States v. Scrushy, 2004 WL 483264, at *9 n.5 (N.D. Ala.

March 3, 2004) ("[T]here is a difference between being surprised by the charge and

being surprised by the evidence supporting a charge.  The function of the bill of

particulars is to reduce surprise at the *charge*, that is, to enable the defendant to

identify what he is alleged to have done in violation of law.  It is not to eliminate

surprise with respect to evidence offered in support of a charge that is clearly

understood by the defendant.") (emphasis in original).  In light of the information

provided in the indictment, as outlined *supra*, the court finds that Defendant seeks

evidentiary details not appropriate for a bill of particulars.  See United States v. Levy,

2013 WL 664712, at *13 (S.D. N.Y. February 25, 2013) (defendant's "request for a

44

recounting of each specific misrepresentation and omission alleged is simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars") (citation and internal quotation marks omitted); United States v. Ghavami, 2012 WL 2878126, at *4 (S.D. N.Y. July 13, 2012) (finding that the defendant's request for the exact misrepresentations made, as well as specific details about the harm caused, is not properly the subject of a bill of particulars).

The court notes that the fact discovery materials are provided to Defendant is an appropriate factor to consider in deciding whether a bill of particulars is warranted. See Roberts, 174 Fed. Appx. at 477 ("A bill of particulars is not required where the information sought has already been provided by other sources, such as the indictment and discovery. . . ."); United States v. Al-Arian, 308 F. Supp. 2d 1322, 1359 (M.D. Fla. 2004) ("However, a bill of particulars is not typically warranted in so far as it seeks information already available through other sources.") (citing United States v. Rosenthal, 793 F.2d 1214, 1227 (11th Cir. 1986) ("Nor is the defendant entitled to a bill of particulars with respect to information which is already available through other sources such as the indictment or discovery and inspection.")).  However, the court recognizes "that the government does 'not fulfill its obligation merely by providing mountains of documents to defense counsel who [a]re left unguided as to which

45

documents" provide the details being sought.  United States v. Long, 2008 WL 11336760, at *5 (N.D. Ga. October 3, 2008).  As the Government outlines, Defendant was provided "with over thirteen thousand (13,000) documents of discovery . . ." but the Government does not point to information therein satisfying Defendant's requests. [Doc. 161 at 18].  In response, Defendant points out that "the discovery was heavily redacted and contained few VINs that were legible."  [Doc. 175].

Another factor to be considered in resolving a request for a bill of particulars is whether Defendant seeks the details about the acts in which *he* engaged in commission of the charged offenses.  Under such circumstances it is doubtful that a defendant could establish that, without the Government providing the details about this evidence, he was not able to prepare a defense to the charged offenses or was surprised.  In a case where the evidence being sought by a bill of particulars consists of activities in which a defendant participated or witnessed, the defendant "'could hardly have been surprised by the government's proof at trial.'"  United States v. Cantu, 557 F.2d 1173, 1178 (5th Cir. 1977) (quoting United States v. Pena, 542 F.2d 292, 293-94 (5th Cir. 1976)); see also United States v. Williams, 113 F.R.D. 177, 179 (M.D. Fla. 1986) (When the information sought involves "events in which one or more of the defendants participated, or which occurred in one or more of the

AO 72A
(Rev.8/82)

defendants' presence[, t]he Eleventh Circuit has held that this sort of information need not be furnished in a bill of particulars.") (citations omitted).  This consideration is partially applicable to the requests, such as, identification of victims and property interests and the misrepresentations made, for a bill of particulars in this case.

With the exception of one category of information being requested, the court finds that Defendant has not demonstrated that the information requested in the bill of particulars is essential to preparation of his defense at trial for the mail and wire fraud charges.  As noted, Defendant requests that the Government specify with respect to the motor vehicles identified by a VIN in the fraud counts "whether those vehicles are stolen cars, cloned VINs, or simply the subjects of internet searches."  [Doc. 103 at 2].  Interpreting and clarifying Defendant's request and based on Defendant's representation that the discovery was heavily redacted and most of the VINs produced in the discovery were illegible, the Government is **ORDERED** to provide the following information for each motor vehicle identified in Counts 2 - 14:

> Whether the VIN specified in the indictment for the motor vehicle is the "authentic" or the "fraudulent" ("cloned") VIN and/or whether the motor vehicle identified is simply the subject of an internet search, that is, not a stolen vehicle.

AO 72A
(Rev.8/82)

For the reasons stated, the court **GRANTS IN PART and DENIES IN PART** Defendant's request [Doc. 103] for a bill of particulars.

## III.   Conclusion

For these reasons, the court **RECOMMENDS** that Defendants' motions [Docs. 97, 100, 101, 130 and 131] to dismiss various counts in the indictment be **DENIED** and that Defendant Tripodis' motion [Doc. 104] to dismiss Counts 15 and 16 be **GRANTED** as unopposed.

And the court **ORDERS** that Defendant Tripodis' motion [Doc. 103] for a bill of particulars is **GRANTED IN PART and DENIED IN PART** as set forth *supra*.

### **Defendant Wilson's Motion to Suppress Identification Testimony**

Defendant Wilson moves [Doc. 117] to suppress the out-of-court photographic identification on May 12, 2017, by his co-Defendant Kakawana Tate ("Tate").[13]   In support of that motion, Defendant contends that the use of a single photograph by the Government was unduly suggestive and that the Government has not established the reliability of the identification.  [Doc. 153 at 4-9].[14]   Defendant also contends that,

---

[13]Defendant is not seeking to suppress any in-court identification by Tate. [Doc. 153 at 4].

[14]Defendant relies in part on a January 6, 2017, "Memorandum for Heads of Department Law Enforcement Components [and] All Department Prosecutors"

AO 72A
(Rev.8/82)

because Tate's identification is "a key and central part of" the evidence against him,

allowing introduction of the out-of-court identification would constitute reversible

error. [Id. at 9-10].[15]   In response, the Government does not contest Defendant's claim

that the identification procedure was unduly suggestive; however, due to the

───────────────

concerning "Eyewitness Identification: Procedures for Conducting Photo Arrays" to argue that the procedure used in this case and information provided in support of the reliability of the identification does not meet the requirements set forth therein. [Doc. 153 at 3, 6, 8; Doc. 153-4 ("DOJ Memorandum") (capitalization deleted)].   The memorandum addresses the procedures recommended when presenting a photo array "[w]hen the perpetrator is a stranger to the witness" and specifically excludes the situation before this court, that is, the use of "'mug books' and single confirmatory photographs, which are outside the scope of [the] memorandum." [DOJ Memorandum at 1 & n.1].   Additionally, the court notes that memorandum does not "create any enforceable substantive rights" that Defendant may rely upon.   See United States v. Taghon, 2016 WL 5247923, at *4 (N.D. Ind. September 21, 2016).   Such memos and policy are "'intended solely as a guide to the exercise of investigative and prosecutorial discretion,'" and "DOJ memos ought not be given great weight because they do not announce 'final decision[s]'" and because "the DOJ 'may well revise its analysis' in light of new information or changed circumstances."   United States v. Christie, 825 F.3d 1048, 1060 (9th Cir. 2016) (citations omitted); and see United States v. Peterson, 2008 WL 4224813, at **6-7 (M.D. Ga. September 5, 2008) (rejecting the defendant's reliance on a DOJ policy as grounds for suppression noting that the DOJ "may give such weight as it chooses to its internal rules" and that the DOJ "has the primary, if not the sole, authority to enforce" its policies) (citation and internal quotation marks omitted).

    [15]The court finds Defendant's arguments that allowing introduction of the out-of-court identification will constitute reversible error to be premature given the simple fact that, until evidence is introduced at trial, there is no way to evaluate the potential prejudicial effect of this identification.

relationship between Defendant Wilson and Tate, the Government argues that the identification is reliable and admissible at trial.  [Doc. 162 at 4-6].  Defendant's reply does not add materially to the discussion of the motion to suppress.  [Doc. 166].

## I.    Background Facts[16]

Pertinent to the issues before the court in resolving Defendant's motion to suppress, the indictment [Doc. 1] contains the following allegations.  In Count One, the indictment alleges that, from approximately September 2014, continuing to approximately July 2017, Defendant Wilson, Tate and others engaged in a conspiracy, in violation of 18 U.S.C. § 371, to commit federal offenses, to wit: (1) to knowingly and unlawfully remove, obliterate, tamper with and alter vehicle identification numbers, in violation of 18 U.S.C. § 511(a); (2) to devise a scheme and artifice to defraud by use of the mails and private and commercial interstate carriers and by use of wire, radio and television communications, in violation of 18 U.S.C. §§ 1341 and 1343; and (3) to receive, possess, conceal, barter, sell and dispose of stolen motor vehicles having crossed State and United States boundaries, in violation of 18 U.S.C.

---

[16]The facts are drawn from the criminal indictment and (as agreed to by the Government and Defendant Wilson) the FBI report of interview and Defendant's transcript of the interview with Tate.  The parties agreed that an evidentiary hearing was not necessary.

§ 2313(a).  [Doc. 1, ¶ 1].  In furtherance of the conspiracy, the indictment alleges as follows.  On December 20, 2015, Defendant Wilson, his co-Defendant Tripodis ("Tripodis") and other unknown individuals stole eight Bentleys from Alpharetta, Georgia, for which Tate obtained fraudulent Florida titles for four of the Bentleys.[17] [Id., ¶ 13].  On February 24, 2016, Defendant Wilson, Tripodis and Tate stole a 2010 Audi S4 sedan and a 2015 Audi Q7 SUV in Knoxville, Tennessee, and drove the vehicles to the Northern District of Georgia.[18]  [Id., ¶ 14].  And, as alleged in Count Seventeen, from approximately December 20, 2015, to approximately April 7, 2016, Defendant Wilson, Tripodis and Tate, aided and abetted by each other, knowingly removed, obliterated, tampered with and altered the vehicle identification number for a stolen 2016 Bentley Continental GT V8S convertible.  [Id., ¶ 23].

The FBI report of the interview with Tate, conducted on May 12, 2017, at the Cherokee County Jail, provides in pertinent part as follows.  [Doc. 117-1 ("Tate FBI Report")].  Tate, using his multiple cellular telephones, identified photographs of

---

[17]Generally, the indictment alleges that Tripodis obtained vehicle registration information from web based sources to use to prepare fraudulent documents for stolen motor vehicles.  He subsequently taught Tate how to obtain the information and to prepare the fraudulent documents.  [Id., ¶¶ 9-10]

[18]On May 27, 2016, Defendant Wilson was found in possession of the stolen Audi S4, with fraudulent plates, in Ohio.  [Id., ¶ 14].

51

stolen vehicles and associated paperwork and of his co-conspirators and discussed text messages with co-conspirators concerning the charged offenses. [Id.]. Tate also provided detailed information about the roles and activities of his co-conspirators. [Id.]. The information provided by Tate and the details recorded on his cellular telephones indicated first-hand knowledge and participation in the charged offenses. [Id.]. With respect to Defendant Wilson, Tate advised "that Tripodis and [Defendant] Wilson obtained duplicate titles for an Audi S5 [sic] and an Audi Q7 at a Department of Motor Vehicle office in Tennessee" and "that Tripodis tasked Tate with creating a fraudulent identification for Wilson." [Id. at 3-4 (capitalization deleted)]. Tate also advised that Defendant Wilson was "habitually late and unfocused when participating in criminal activities with Tripodis" contributing to the discovery by law enforcement of one of the Bentleys stolen from the dealership in Alpharetta because Wilson, who was supposed to be watching out for police, failed to warn Tripodis about a marked police unit driving by as Tripodis exited a parking lot, apparently located near the Atlanta Airport where Tripodis stored some stolen vehicles. [Id. at 4 (capitalization deleted)]. The agents later showed Tate a photograph of a black male driving a black Bentley in a parking garage. [Id.; Doc. 153-3 ("Photograph")]. "Tate recognized the

52

black male and said, 'That's Mark,'" which the agents understood to be referring to Defendant Wilson.  [Tate FBI Report at 4].

The transcript of the interview provides in pertinent part as follows.  [Doc. 153-2 ("Tate FBI Transcript")].  The first references to Defendant Wilson concerned him being late and unfocused and a question by the agents about what he did causing that description.  [Id. at 3].  Tate explained, although he personally had not been to the warehouse by the airport, that Tripodis and Defendant Wilson went to a warehouse to get a car, that Defendant Wilson was supposed to be watching out for law enforcement, but that, as Tripodis was leaving in a stolen Bentley, an Atlanta police officer drove by and Tripodis had to flee leaving the Bentley.  [Id. at 3-4].  Tripodis blamed Defendant Wilson for not paying attention.  [Id. at 4].  The agent asked, "So why did Mark . . . so, you obviously knew Mark.  You met Mark multiple times or?"  [Id. at 5].  Tate responded, "Yeah, so um  . . . ."  [Id.].  The agents then asked about Mark moving to Ohio and if "there was a falling out between the two of you?"  [Id.].  Tate responded, "Yeah.  Um, Mark . . . I mean I don't know how else to say it.  Mark's a f**k up and um the only reason why he was around as long as he was around was because they're brothers . . . ."  [Id.].  Tate then provided details about the fights between Tripodis and Defendant Wilson but that he, Tate, did not know what "straw

53

that broke the camel's back was.  But I know the minute he got that Audi he got the hell on.  It's like he went to Ohio and that's all he wanted was a car."  [Id. at 6-7].

The agent then asked about the Audi motor vehicles stolen in Tennessee and if Tate knew where the vehicles were taken.  [Id. at 7].  Tate responded, "They parked them by the airport" and explained that he "was with them when they went to . . ." Tennessee.  [Id.].  Tate explained that he knew where Tripodis puts the vehicles, in "either one of three spots by the airport."  [Id.].  Tate also advised that Defendant Wilson took the Audi S-4, correcting the agent who identified the vehicle as an A4. [Id. at 7-8].

The agents then asked Tate questions about other participants and conspirators. [Id. at 8-10].  At that point, one agent placed his cell phone on the table and asked, "Do you um, do you recognize this person?"  [Id. at 10].  Tate responded, "That's Mark."  [Id.; Photograph].

Additional information will be set forth as necessary during discussion of Defendant's motion to suppress.

54

## II.     Discussion

"To violate due process, an identification procedure used by the police must be unnecessarily suggestive and create a substantial risk of misidentification." Johnson v. Dugger, 817 F.2d 726, 729 (11th Cir. 1987) (citing Neil v. Biggers, 93 S. Ct. 375, 380-81 (1972)); and see Perry v. New Hampshire, 132 S. Ct. 716, 724 (2012) ("first, . . . due process concerns arise only when law enforcement officers use an identification procedure that is both suggestive and unnecessary").  "Determining whether an identification is so unreliable as to violate due process requires [the court] to answer two questions:  (1) whether the original identification procedure was unduly suggestive; and if so, (2) whether the procedure, given the totality of the circumstances, created a substantial risk of misidentification at trial." Marsden v. Moore, 847 F.2d 1536, 1545 (11th Cir. 1988); see also United States v. Diaz, 248 F.3d 1065, 1102 (11th Cir. 2001) ("This court employs a two-step analysis in assessing the constitutionality of a trial court's decision to admit an out-of-court identification. . . .  First, we must determine whether the original identification procedure was unduly suggestive.  If we conclude that it was suggestive, we then must consider whether, under the totality of the circumstances, the identification was nonetheless reliable.") (citation omitted).  If the identification procedure is not unduly suggestive, "that ends

55

the inquiry." Williams v. Weldon, 826 F.2d 1018, 1021 (11th Cir. 1987).  As the

Supreme Court recently reiterated in Perry, "The Court adopted a judicial screen for

reliability as a course preferable to a *per se* rule requiring exclusion of identification

evidence whenever law enforcement officers employ an improper procedure.  The due

process check for reliability . . . comes into play only after the defendant establishes

improper police conduct." 132 S. Ct. at 726; and see United States v. Elliot, 732 F.3d

1307, 1310 (11th Cir. 2013) ("when no improper law enforcement activity is involved,

exclusion of an eyewitness identification is unnecessary").  Following the decision in

Perry, the district court in United States v. Henry, 939 F. Supp. 2d 1279 (N.D. Ga.

2013), stated, "The defendant has the burden of showing that the eyewitness

identification was derived through 'impermissibly suggestive' means[,]" and "[o]nly

after the defendant meets this burden must the government show the identification was

reliable independent of the suggestive procedure." Id. at 1292 (citations omitted); and

see United States v. Mustafa, 2012 WL 1904595, at *5 (N.D. Ga. April 12, 2012)

(same), adopted by 2012 WL 1903255 (N.D. Ga. May 25, 2012).

If the procedure is unduly suggestive, the court must determine whether "the

identification was nonetheless reliable." Cikora v. Dugger, 840 F.2d 893, 895 (11th

Cir. 1988). "This second stage involves consideration of five factors identified by the

56

Supreme Court in <u>Neil v. Biggers</u>:  opportunity to view, degree of attention, accuracy of the description, level of certainty, and length of time between the crime and the identification." <u>Id.</u> (citing <u>Biggers</u>, 93 S. Ct. at 382).  "Under this analysis, 'reliability is the linchpin in determining the admissibility of identification testimony.'" <u>Williams</u>, 826 F.2d at 1021 (quoting <u>Manson v. Brathwaite</u>, 97 S. Ct. 2243, 2253 (1977)); <u>and see</u> <u>Perry</u>, 132 S. Ct. at 724-25 (same).  In <u>Perry</u>, summarizing prior decisions, the Supreme Court stated, "Where the 'indicators of a [witness'] ability to make an accurate identification' are 'outweighed by the corrupting effect' of law enforcement suggestion, the identification should be suppressed. . . .  Otherwise, the evidence (if admissible in all other respects) should be submitted to the jury."  132 S. Ct. at 725 (citation omitted); <u>and see</u> <u>United States v. Walls</u>, 237 Fed. Appx. 599, 601-02 (11th Cir. 2007) (Unless a court finds that there is a very substantial likelihood of irreparable misidentification, "arguments about the accuracy of the identification [go] to the weight of the testimony, not its admissibility.") (citing <u>Manson</u>, 97 S. Ct. at 2254).  As the Supreme Court explained, "under our adversary system of justice, cross-examination has always been considered a most effective way to ascertain truth."  <u>Watkins v. Sowders</u>, 101 S. Ct. 654, 659 (1981).

In this case, there is no dispute that during the interview the FBI agents presented to Tate a single photograph and asked the question, "Do you um, do you recognize this person?" [Id. at 10].  Tate responded, "That's Mark." [Id.].  "Courts have concluded that showing a witness only one photograph is unduly suggestive." Henry, 939 F. Supp. 2d at 1292 (listing cases).  However, if the evidence supports a finding that the identification is otherwise reliable and that there is no substantial risk of misidentification, then Tate's out-of-court identification of Defendant Wilson should not be suppressed allowing the jury to weigh the evidence at trial.  In making this analysis, the court finds, because the circumstances of this case do not involve an identification by a stranger to Defendant Wilson, the Biggers factors are evaluated in light of that fact.[19]

---

[19]Under the circumstances, Defendant's analysis the Biggers' factors is nonsensical.  For example, for the first two factors involving the witness' opportunity to view the defendant and attention to defendant, Defendant argues that because the Government cannot show that Tate viewed Defendant Wilson *at the time* the surveillance photograph was taken or the crime committed on that date, the Government simply cannot satisfy these factors.  [Doc. 153 at 7-8].  According to Defendant's argument, if a close family member or life-long friend of a defendant identified that defendant from a surveillance photograph obtained as the defendant committed a crime that was not witnessed *at the time* by the family member or friend, the identification would not satisfy the Biggers' factors and would be unreliable.  The case law cited *infra* does not support Defendant's arguments, and Defendant cites no legal authority for application of these Biggers' factors as he proposes to the circumstances of this case.

58

Courts considering a single photographic identification under circumstances similar to those before this court focus on the witness' overall "opportunity to know, view and recognize the Defendant" because, "[a]fter all, this is not the case of a fleeting bystander identification, or that of a stranger." United States v. Johnson, 2015 WL 13657738, at *3 (N.D. Ga. July 15, 2015), report and recommendation adopted by 2015 WL 9412923 (N.D. Ga. December 22, 2015); and see United States v. Cannington, 729 F.2d 702, 711 (11th Cir. 1984) (finding no error in allowing identifications because the three witnesses "had observed [the defendant] at close range on numerous occasions"); United States v. Juarez, 2019 WL 2482167, at *7 (N.D. Ga. January 11, 2019) ("Given the close prior relationship of the witness to Defendants, the [single] photographic identification is, by its very nature, reliable."), report and recommendation adopted by, 2019 WL 1488396 (N.D. Ga. April 4, 2019); United States v. Robinson, 2007 WL 9676863, at *8 (N.D. Ga. November 19, 2007) ("In particular, when the witness making the identification has met the defendant on numerous occasions-as opposed to being merely an eyewitness to a single offense committed by the defendant-the identification can be considered reliable."), report and recommendation adopted by 2008 WL 11383732 (N.D. Ga. February 22, 2008).

59

In this case, there is evidentiary support for finding that Defendant Wilson and Tate were active co-conspirators in the charged offenses and had a sufficient preexisting relationship for the court to find that there is not a substantial likelihood of misidentification based on the single photographic identification.  Although, as Defendant points out, Tate recounted information about Defendant Wilson obtained from Tripodis (whom Tate knew was Defendant Wilson's brother) [Tate FBI Transcript at 3-5 (discussing warehouses by the airport and Defendant Wilson's failure to warn Tripodis of the presence of law enforcement and causing the seizure of one of the stolen Bentleys)], other information establishes Tate's active role in the conspiracy and other charged offenses.  Wilson's role in the conspiracy was to obtain information to be used to prepare fraudulent documents for the motor vehicles stolen by his co-conspirators, and the photographs and texts on his cellular telephone corroborated his discussion about his active participation and first-hand knowledge of the participants.  [Doc. 1, ¶¶ 9-10; Tate FBI Report at 1-4].  With respect to interaction with Defendant Wilson, as set forth in the indictment [Doc. 1, ¶ 14 (alleging that Tate, along with Tripodis and Defendant Wilson traveled to Tennessee in February 2016 and stole two Audi motor vehicles and then drove back to Atlanta)], Tate discussed the trip to Tennessee to steal the Audi motor vehicles during his

60

interview.  Tate also stated that Defendant Wilson took one of the vehicles, the Audi

S-4, to Ohio.  [Tate FBI Transcript at 7-8].  The indictment alleges that Defendant

Wilson was found in Ohio, in May 2016, in the stolen Audi S-4.  [Doc. 1, ¶ 14].  Even

if the Tennessee trip is the only direct interaction with Defendant Wilson, traveling

with him to Tennessee and back provides sufficient opportunity to observe Defendant

Wilson in order to make an identification.   This information supports the

Government's argument based on the interview that Tate "obviously knew Mark" and

"met Mark multiple times . . . ."  [Tate FBI Transcript].  For these reasons, the court

finds that Tate had the "opportunity to know, view and recognize the Defendant"

required to satisfy the first two Biggers' factors.  Johnson, 2015 WL 13657738, at *3

(finding that the "direct, face-to-face interactions, and this extended relationship gave

[the witness] a strong basis to know and recognize the Defendant"); Henry, 939 F.

Supp. 2d at 1291-92 (noting that the witnesses stated that they "had seen Henry [at the

apartment building] 'a couple of times,' with one of them reporting that he drove an

SUV[,]" the court found the single photographic identification reliable because the

witnesses "had multiple opportunities to observe Defendant at [the apartment

building], so much so that one of them recalled the general type of vehicle he drove"

61

and, because they lived in close proximity to the apartment Henry visited, they had the opportunity to observe him).

With respect to the third <u>Biggers</u>' factor, Defendant is correct that the agents apparently did not obtain a description of Defendant Wilson from Tate before showing him the single photograph. The court in <u>Johnson</u> addressed this omission: "It is unfortunate that the agent did not ask [the witness] to provide a physical description of 'Albert' [the name by which the witness knew the defendant], prior to displaying any photograph, and this omission weighs against finding reliability." 2015 WL 13657738, at *3. The same result applies in this case. However, as found by other courts, this omission is tempered by other facts that support a finding that Tate's recollection was reliable, such as, his detailed accounting of his and other participants' activities in the conspiracy and the fact that he identified "Mark" and "Mark's" role in the conspiracy prior to being shown the surveillance photograph. <u>See United States v. Gibbs</u>, 2018 WL 6331341, at *10 (N.D. Ga. December 4, 2018) (noting that the witness, who previously knew the defendant, had identified the defendant as a participant in the robbery "prior to viewing any photographs of the defendant" supports a finding of reliability); <u>Johnson</u>, 2015 WL 13657738, at *3.

62

Additionally, there is absolutely no indication the agents prompted Tate to identify the single photograph as Defendant Wilson further enhancing the reliability of Tate's identification. At the time that the photograph was presented to Tate, he and the agents had been discussing other individuals, besides Defendant Wilson, involved in the criminal activities. [Tate FBI Transcript at 8-10]. And the agent, when presenting the photograph, simply asked, "Do you um, do you recognize this person?" [Id. at 10]. The lack of prompting supports a finding of reliability, even in the absence of obtaining a description prior to the identification. See Gibbs, 2018 WL 6331341, at *10 (noting that there was no indication that the agents were "coaching" the witness or "pressing him to make anything other than a reliable identification"); Henry, 939 F. Supp. 2d at 1293 (noting that the agent's manner was non-coercive and that he asked open-ended questions "thus making any identification by these individuals more reliable and less influenced by an overly suggestive procedure").

As to the Biggers' factor involving the certainty of Tate's identification, Defendant argues that the agents did not engage in a discussion with Tate as to how sure he was about his identification and, for that reason, that the Government has not satisfied this factor. The court disagrees. The transcript of the Tate's interview satisfies this factor. As noted, at the time that Tate was shown the photograph, he and

63

the agents were discussing other individuals.  [Tate FBI Transcript at 8-10].  And the

agent, when presenting the photograph, simply asked, "Do you um, do you recognize

this person?"  [Id. at 10].  Without any apparent hesitancy, Tate responded, "That's

Mark."  [Id.].   He did not respond that the photograph "looks like" or "might be"

Mark or offer any other response indicating a lack of certainty.  Other courts have

relied on the witness' lack of hesitancy and apparent certainty in making the

identification to satisfy this factor.  See Johnson, 2015 WL 13657738, at *3;  Henry,

939 F. Supp. 2d at 1292-93; Robinson, 2007 WL 9676863, at *8.

The final Biggers' factor to consider is the length of time between Tate's

observations of Defendant Wilson and his identification in May 2017.  The record is

not clear as to this period of time.  Arguably, Tate did not have an opportunity to

observe Defendant Wilson after the trip to Tennessee in late February 2016 to steal

the Audi motor vehicles because, as Tate stated, once Defendant Wilson had the Audi

S-4, he left for Ohio, where the indictment alleges he was found in May 2016 in the

stolen Audi.  [Doc. 1, ¶ 14; Tate FBI Transcript at 6-7].  The impact of this period of

over a year on the reliability of Tate's identification depends in part on how much and

how often before the trip to Tennessee he interacted with Defendant Wilson;

information that the court does not have before it - including whether Tate and

64

Defendant interacted directly subsequent to May 2016. Based on the evidence before the court, this factor weighs against reliability especially when considering Defendant's argument that the quality of the surveillance photograph and partially obscured facial view of the individual depicted undermines the reliability of Tate's identification.

Defendant is correct that the photograph is of poor quality and that the face in the photograph is partially obscured. [Photograph]. In United States v. Vance, 764 F.3d 667 (7th Cir. 2014), the Seventh Circuit Court of Appeals considered a defendant's argument that the witness' identification of him was not reliable because his face was partially obscured by a mask, leaving only his eyes uncovered. Id. at 674. The court rejected the defendant's argument based on the fact that the victim-teller who identified the defendant had known the defendant since childhood. Id. ("That he could be identified from such a photograph, though partially masked, by a person who had known him for many years was entirely plausible."); and see United States v. Williams, 698 F.3d 374, 378-79 (7th Cir. 2012) ("Although the mask covered [the defendant's] head almost completely, [the defendant's ex-girlfriend's] testimony that she recognized him from the shape of his body and how he moved was not implausible, as she had known him for 18 years. (Had she not know him so well, there

might be grave doubts about the reliability of her face-obscured identification.).").

The weighing of the reliability of Tate's identification given the nature of the
surveillance photograph likewise should be evaluated based on the nature of his past
association with Defendant Wilson, which, again, is not fully developed in the record
currently before the court.  Based on the current record before the court, in light of the
period of time between Tate's last observations of Defendant Wilson and poor quality
of the photograph, the final Biggers' factor weighs against reliability.

Taking into account the totality of the circumstances, including the record and
the Biggers' factors weighing in favor of a reliability finding as outlined *supra*, the
court concludes that, while there are some questions regarding reliability, there is not
a very substantial likelihood of misidentification as required to foreclose the jury's
consideration of Tate's identification.  Accordingly, "arguments about the accuracy
of the identification [go] to the weight of the testimony, not its admissibility." Walls,
237 Fed. Appx. at 602; and see Johnson, 2015 WL 13657738, at *3 (while noting that
"there are grounds by which a jury might disbelieve [the witness'] identification[,]"
the court stated that fact "does not mean that suppression is warranted"); accord
United States v. Stokes, 631 F.3d 802, 806-07 (6th Cir. 2011) (the court rejected the
defendant's argument that the victim-witness' identification was unreliable to the

AO 72A
(Rev.8/82)

extent it was based on briefly observing the defendant, whose face was covered during the first robbery and partially obscured by sunglasses during the second robbery, because the witness was subjected to cross-examination and provided the jury with "ample grounds for relying" on the identification).[20]

## III.   Conclusion

For the foregoing reasons, the court **RECOMMENDS** that Defendant's motion [Doc. 117] to suppress Tate's out-of-court identification be **DENIED**.

### Defendant Tripodis' Motion to Strike Surplusage

Defendant Tripodis moves this court to strike from the manner and means section of Count 1 of the indictment the phrase indicating that he "described himself as a 'scientist' of VIN cloning[.]" [Doc. 102 (citing Doc. 1 ¶ 9)]. Defendant argues that the language is unnecessary, will unduly inflame the jury, confuse the issues and blurs the elements of the offenses charged and that inclusion of the phrase "essentially

---

[20]The court notes that in Gibbs the district court denied the motion to exclude the out-of-court identification "assuming that [the witness] testifie[d] at trial and [was] subject to cross examination." 2018 WL 6331341, at *10. While this court is not recommending that such a limitation be placed on allowing testimony at trial concerning Tate's out-of-court identification, the district court may conclude - given the gaps pointed out in the evidence currently in the record - that such a limitation is necessary in order to allow the jury to adequately weigh the reliability of Tate's identification.

compels testimony from" him.  [Id. at 2].  In response, the Government argues that the phrase is a quote from Defendant regarding his opinion of himself and is relevant to the issues at trial, that is, relevant to Defendant's knowledge and intent to commit the charged offenses involving obtaining duplicate fraudulent vehicle titles and cloning VINs, and is not inflammatory.  [Doc. 161 at 19-20].  In reply, Defendant contends that the Government has mis-characterized the evidence involving Defendant making the statement and that the statement was made in reference to "his knowledge of human behavior and detecting lies, not VIN cloning."  Defendant also argues that the Government's arguments regarding the relevancy of the statement are incorrect especially when the alleged quotation is not provided with the surrounding context.  [Doc. 178].

Rule 7(d) of the Federal Rules of Criminal Procedure provides that, "Upon the defendant's motion, the court may strike surplusage from the indictment . . . ."  Fed. R. Crim. P. 7(d) (as amended 2009).  Although Rule 7(d) "authorizes the Court to strike surplusage from an indictment on motion of the defendant[,]" Fed. R. Crim. P. 7(d), "[a] motion to strike surplusage from an indictment should not be granted unless it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial. . . .  [T]his is a most exacting standard." United States v. Awan, 966 F.2d

1415, 1426 (11th Cir. 1992) (citations and internal quotation marks omitted); accord United States v. Brye, 318 Fed. Appx. 878, 880 (11th Cir. 2009) (same); United States v. Smallwood, 2011 WL 2784434, at *10 (N.D. Tex. July 15, 2011) ("the court will not strike allegations that are *relevant*, no matter how prejudicial or inflammatory they may be to the defendant") (emphasis in original).  And, in order to determine whether the allegations are relevant to the charges and the evidence introduced at trial, "[t]he Court may reserve ruling on a motion to strike surplusage until hearing the evidence and determining its relevance at trial."  United States v. Al-Arian, 308 F. Supp. 2d 1322, 1333 (M.D. Fla. 2004).

It is evident from the competing arguments by Defendant and the Government that Defendant called himself a "scientist" but that Defendant attributes the descriptor to a different type of knowledge than does the Government.[21]  Apparently, there will be evidence offered that Defendant used that descriptor, and, if used in the context alleged in the indictment, the description of being a "scientist" of VIN cloning arguably is relevant to the manner and means by which the alleged charges were committed.  Other allegations in the indictment, including that Defendant obtained the

_____

[21]And, because Defendant did not present, although he could easily have done so, the argument alleging that the quotation was taken out of context in his motion to strike, the Government has not had an opportunity to reply.

69

information to prepare the fraudulent duplicate titles, used those titles to secure cloned VINs to be used on stolen vehicles and then taught other Defendants how to complete that process or would sell fraudulent duplicate titles for $3,000-$5,000 would tend to support the indictment's allegation that Defendant Tripodis "described himself as a 'scientist' of VIN cloning[.]" [Doc. 1 ¶¶ 9-11]. Just because Defendant may not like the sound of the phrase used in the indictment, that dislike does not satisfy his burden. See United States v. Williams, 2008 WL 4867748, at *4 (S.D. Fla. November 10, 2008) (refusing to strike word "corrupt" to describe hedge fund manager and "sham" to describe nature of consulting agreement because the descriptors were relevant to Government's contentions regarding the defendant's criminal conduct).

Accordingly, the court finds that the allegedly surplus language in the indictment identified by Defendant in his motion contains allegations that are relevant and material to the charged offenses. Arguments regarding the interpretation of and context of the phrase are better presented at trial in light of the evidence offered and introduced. Because Defendant must prove both that the challenged allegations are not relevant as well as being inflammatory and prejudicial, see United States v. Salvagno, 306 F. Supp. 2d 258, 268 (N.D. N.Y. 2004) ("[I]f evidence of the allegation is admissible and relevant to the charge, then regardless of how prejudicial the

70

language is, it may not be stricken.") (citations and internal quotation marks omitted), the court recommends that the motion to strike be denied without prejudice to being renewed and that any reconsideration of the motion occur after introduction of the Government's evidence at trial.  See United States v. Kelley, 2009 WL 2176347, at *2 (S.D. Ala. July 17, 2009) ("After the court has heard all the evidence, the defendants may make a motion to reconsider this ruling as to specific surplus language that they contend is unfairly prejudicial and inflammatory); United States v. Alexander, 2008 WL 2130185, at *4 (W.D. La. May 18, 2008) (noting, to the extent the defendant contends some of the allegations in the indictment are not admissible, the court may address these concerns by summarizing the indictment for the jury, instead of reading it, at the beginning of trial, and to the extent evidence is held inadmissible, related allegations in the indictment can be stricken before the indictment is provided to the jury for deliberations).[22]

For the foregoing reasons, the court **DENIES** the motion [Doc. 102] to strike surplusage.

---

[22]The Eleventh Circuit Court of Appeals "ha[s] found that a defendant was not unduly prejudiced by language that was not stricken from an indictment where the court provided the jury with only a summary of the indictment that did not include references to the disputed language." Byre, 318 Fed. Appx. at 880.

## Defendant Tripodis' Motion to Suppress Evidence

Defendant Tripodis filed a motion to suppress evidence seized on April 28, 2019, resulting from a warrantless search of a silver Acura that he was driving. [Doc. 98]. Evidentiary hearings were held on the motion on July 31, 2019, [Doc. 163], and on October 1, 2019, [Doc. 172].[23] In his post-hearing brief, Defendant argues that the grant of authority to conduct warrantless searches in the parole certificate is limited to parole officers and that he did not consent to any other law enforcement officers conducting such a search; that the parole certificate(s) entered into evidence are not authentic; that there was no reasonable suspicion to conduct the search; and that there is no governmental interest in conducting a search of an arrested parolee. [Doc. 183]. In response, Government the contends that the parole search did not exceed its proper scope and that the issue of "consent" is not involved in such searches; that the parole certificate(s) introduced are authentic; and that, as a parolee, Defendant lacked a reasonable expectation of privacy, such that the search was executed lawfully pursuant to the standard condition of his parole. [Doc. 191]. Defendant's reply, addressing disagreement with a few factual assertions by the Government, does not alter the

---

[23]Citations to the transcripts of the hearing, which are paginated sequentially, are: (Tr. at ).

72

court's analysis. [Doc. 192]. For the reasons stated *infra*, the court recommends that Defendant's motion to suppress be denied.

## I.   Factual Background

On March 30, 2015, Supervising Parole Officer ("P.O.") Courtney Thompson, of the Georgia State Board of Pardons and Parole ("BOPP"),[24] met with Defendant Tripodis at his then residence, upon Defendant's release from prison, in order to review and execute his parole certificate and to ensure that "he understands the conditions and terms of being under supervision as a parolee." (Tr. at 73-75, 77-78). P.O. Thompson served on Defendant his parole certificate, which she identified based on her signature and initials on the form and having observed Defendant execute the

---

[24]P.O. Thompson, who at the time of the hearing, had been with BOPP for approximately ten years, is a District Operations Manager/Criminal Investigator Level 3. (Tr. at 73). She began her career with BOPP as an officer supervising parolees and has held positions as a specialized officer dealing with "high-risk, high-need" parolees and has been a field training officer and Assistant Chief. (Tr. at 73). She has certifications as an instructor. (Tr. at 74). In 2015, when she began supervising Defendant, she was training new officers regarding how to supervise parolees. (Tr. at 74).

form on March 30, 2015.[25]  The P.O. also handwrote notes on the form regarding Defendant's address and contact phone numbers.  (Tr. at 75-77; Gov't Exh. 1).[26]

The purpose of having Defendant execute a second parole certificate is to ensure that he understands the conditions of his parole.  (Tr. at 77).  Sitting in Defendant's kitchen at his residence, P.O. Thompson read verbatim the parole certificate to Defendant and explained what each condition of supervision means.  (Tr. at 77-78).  She was aware that Defendant had four years of college education at Emory University and stated that he was articulate.  He did not appear to be impaired or under the influence of drugs or alcohol as she spoke to him.  (Tr. at 78-79).  She specifically read and explained the provision allowing warrantless searches which provides:

> 2.  Law/Immediate Notification/Searches:  I will not violate the law of any governmental unit.  I will immediately notify my parole officer if I am arrested for any offense, including a traffic offense.  My parole officer or any other parole officer may, at any time, conduct a warrantless

---

[25]The P.O. obtained a copy of the parole certificate from the BOPP database where it is maintained.  (Tr. at 81).

[26]P.O. Thompson also identified the same form, dated March 18, 2015, which was executed by Defendant before his release from prison.  (Tr. at 75-77).  All parolees must execute the parole certificate in order to be released on parole.  (Tr. at 76).  The P.O. obtained a copy of the form from the prison from which Defendant was released.  Although the prison maintains in their database the "original" form, a copy of that form is transmitted upon request to the BOPP database.  (Tr. at 81-82).

74

search of my person, papers, and place of residence, automobile, or any
other property under my control.

(Tr. at 79; Gov't Exh. 1).[27]  Defendant did not ask any questions about the conditions

of his parole.  (Tr. at 79).

After she scanned a copy of the executed parole certificate into her cellular

phone to be uploaded into the BOPP database, Defendant kept the original of the

certificate.  (Tr. at 79, 83, 85).  Defendant was on parole in April 2016.  (Tr. at 80).

In April 2016, Defendant was under the supervision of P.O. Carmen Stanfield.[28]  (Tr.

at 4-5).

On April 27, 2016, P.O. Stanfield requested and obtained a parole warrant for

Defendant's arrest for three reasons.  First, she had been contracted by Task Force

---

[27]P.O. Thompson testified that a supervisor's permission is not required in order
for a supervising P.O. to conduct a warrantless search of a parolee because a parolee
automatically waives his Fourth Amendment rights.  (Tr. at 84-85).  She also testified
that BOPP regulations allow other law enforcement officers to participate in a
warrantless search conducted by a parole officer.  (Tr. at 85).

[28]At the time of the hearing, the P.O.'s last name was Capps; however, for the
purposes of reciting her testimony, the court will refer to her as P.O. Stanfield.  (Tr.
at 4).  The P.O. worked for the BOPP for approximately one and one-half years, from
January 15, 2015, to May 31, 2016.  (Tr. at 5).

AO 72A
(Rev.8/82)

Officer ("TFO") Brian Gibbs,[29] City of Alpharetta Police Department, who advised that Defendant was a suspect in an investigation being conducted in north Atlanta regarding missing vehicles. (Tr. at 6, 9).  Second, Defendant's wife at the time, Jaytona Tripodis, had advised the P.O. that Defendant had been outside the State of Georgia, and the P.O. knew that Defendant had not requested nor been granted permission to travel outside of the state, a violation of his parole. (Tr. at 6-7).  And the P.O. had been speaking with Defendant's supervising federal probation officer, Kelly Adcock, about the difficulties in contacting Defendant and determining his residence and the fact that they were receiving conflicting information from Defendant. (Tr. at 8).  P.O. Stanfield directed Defendant to report to the parole office, located in Fayetteville, Georgia, for an administrative hearing, on April 28, 2016. (Tr. at 6, 8).  Although the testimony about Defendant's arrival, leaving and returning to the parole office is confusing, the court finds the following to be the factually credible sequence of events.

---

[29]TFO Gibbs has been employed with the police department since 2006 and was a detective.  He is serving as a task force officer with the Federal Bureau of Investigation ("FBI"). (Tr. at 44-45). While he was providing assistance to other law enforcement officers, he learned of an investigation regarding the theft of high-end vehicles from Bentley of Atlanta.  (Tr. at 45-46).  Defendant Tripodis had been identified as a suspect in the theft of the vehicles, and TFO Gibbs was aware that Defendant was on parole.  (Tr. at 46).

P.O. Stanfield was aware, from speaking with Jaytona Tripodis, that Defendant was driving to the office in Jaytona's silver Honda or Acura (the P.O. could not recall the make of the vehicle). (Tr. at 13, 26-27, 42-43). TFO Gibbs, having been advised by the P.O. about the hearing involving Defendant on April 28, 2016, arrived at the office, and, as he was driving by the front of the office, observed the silver Acura that he knew, based on the tag, was registered to Jaytona Tripodis, parked outside.[30] (Tr. at 47-48, 51-52, 63). P.O. Stanfield, who was in the back of the office and did not see Defendant arrive, testified that the secretary sitting at the front desk advised her that Defendant arrived at the office in the silver Honda/Acura. (Tr. at 10, 23, 26). P.O. Stanfield was not able to meet with Defendant immediately, and, without permission, Defendant left the office. No one observed how he departed. (Tr. at 10, 28, 47-48, 52-53). After an unspecified amount of time, Defendant returned to the office. The silver Acura was no longer parked outside of the office leaving P.O. Stanfield and TFO Gibbs to believe that Defendant left in the vehicle but did not come back in it. (Tr. at 10-12, 25, 48, 52-53).

---

[30]TFO Gibbs had previously conducted surveillance at Defendant's residence and observed the Acura parked outside. He ran the tag on the vehicle at that time and determined that it was registered to Jaytona Tripodis. (Tr. at 52, 62-63).

AO 72A
(Rev.8/82)

At the hearing, Defendant was placed under arrest.  (Tr. at 12).  He was questioned about how he arrived at the hearing, and he responded that he had been dropped off and stated that a friend had the vehicle at a nearby Chick-Fil-A.  (Tr. at 12-14, 31).  When Defendant's person was searched prior to being transported to jail by a Fayette County Sheriff Officer, a set of keys for the Acura were found on his person but not seized.  The keys were part of Defendant's property at the jail.  (Tr. at 30-31, 54).  Defendant had denied having keys to the Acura.  (Tr. at 30-31, 54).  TFO Gibbs testified that the keys were not seized by him because he did not know that the Acura was going to be searched.  (Tr. at 54).  After Defendant was transported, a search was conducted for the Acura because P.O. Stanfield wanted to search the vehicle pursuant to the warrantless search condition set forth on Defendant's parole certificate.  (Tr. at 14-15, 18).  In five to ten minutes, TFO Gibbs found the vehicle parked behind businesses located next door to the parole office.  (Tr. at 48, 54-55, 60).  The court also finds the following facts credible as to the execution of the search of the vehicle.

Because the Acura was locked, P.O. Stanfield requested that a Sheriff's Officer use a "slim jim" to force open the lock.  (Tr. at 32, 55-56).  While waiting for the vehicle to be opened, TFO Gibbs observed through the windows of the Acura

78

numerous cellular telephones and paperwork.  (Tr. at 56-57, 60).  Once the vehicle was opened, P.O. Stanfield, assisted by TFO Gibbs and possibly another P.O., conducted the search of the Acura and removed items, including a wallet, from the vehicle.  All of the seized items were turned over to TFO Gibbs.  (Tr. at 36, 18-19, 50, 57-58, 63).

Additional facts will be set forth as necessary during discussion of the motion to suppress.

## II.    Discussion

Defendant filed a motion [Doc. 98] to suppress evidence.  In his post-hearing brief in support of the motion to suppress evidence, Defendant challenges the warrantless April 28, 2016, search of a silver Acura driven by Defendant that day. Defendant contends that the search violated his Fourth Amendment rights because the warrantless search authority in his conditions of parole was limited to parole officers but that a local law enforcement officer participated in the search, because Defendant did not consent to extending that search authority to other law enforcement officers, however, the parole certificates introduced into evidence were not authentic and because there was no reasonable suspicion for the search.   [Doc. 183].   The Government opposes the motion to suppress contending that the search did not exceed

its proper scope, that the parole certificates were properly authenticated and that the search was lawful pursuant to the standard condition of Defendant's parole status. [Doc. 191].   Defendant's reply does not add to the discussion of the motion to suppress based on the facts found credible by the court.

In Samson v. California, 126 S. Ct. 2193 (2006), the Supreme Court addressed a warrantless search of a parolee based on a condition of his parole.  The Supreme Court first affirmed that when resolving challenges under the Fourth Amendment, courts "'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment."   126 S. Ct. at 2197 (citation omitted).  The Court then discussed the holding in United States v. Knights, 122 S. Ct. 587 (2001), in which the Court upheld the warrantless search of a probationer's apartment based on a reasonable suspicion of criminal activity and on a condition of supervision providing for a warrantless search.  Samson, 126 S. Ct. at 2197.  The Court noted that, balancing the significantly diminished expectation of privacy held by the probationer against the legitimate governmental interests served by probation searches, "we held that '[w]hen an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the

80

probationer's significantly diminished privacy interests is reasonable.'" Id. at 2198 (quoting Knights, 122 S. Ct. at 592). However, the Supreme Court noted that under the circumstances of that case, "we did not reach the question whether the search would have been reasonable under the Fourth Amendment had it been solely predicated upon the condition of probation." Id. at 2198 (citation omitted). That question was resolved, in the context of a parolee search, by the Supreme Court in Samson. Id.

First, the Supreme Court noted that "parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment." Id. Second, "as [the Supreme Court] found 'salient' in Knights with respect to the probation search condition, the parole search condition under California law-requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer 'at any time,' . . . was 'clearly expressed' to [the defendant]." Id. at 2199 (citations omitted). Accordingly, the Supreme Court stated: "Examining the totality of the circumstances pertaining to [the defendant's] status as a parolee, 'an established variation on imprisonment,' . . . including the plain terms of the parole search condition, we conclude that [the

81

defendant] did not have an expectation of privacy that society would recognize as legitimate." Id. (citations omitted).

Compared to a parolee's lack of a reasonable expectation of privacy under these conditions, the Supreme Court stated:

> The State's interests, by contrast, are substantial.  This Court has repeatedly acknowledged that a State has an "'overwhelming interest'" in supervising parolees because "parolees . . . are more likely to commit future criminal offenses." . . .  Similarly, this Court has repeatedly acknowledged that a State's interests in reducing recidivism and thereby promoting reintegration and positive citizenship among probationers and parolees warrant privacy intrusions that would not otherwise be tolerated under the Fourth Amendment.

126 S. Ct. at 2200 (citations omitted).  The Supreme Court found that "California's ability to conduct suspicionless searches of parolees serves its interest in reducing recidivism, in a manner that aids, rather than hinders, the reintegration of parolees into productive society."   Id. at 2200.   For the reasons cited, the Supreme Court "conclude[d] that the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee."   Id. at 2202.   Accordingly, Defendant's argument that reasonable suspicion was necessary in order to justify the search of the Acura is foreclosed by the Supreme Court's decision in Samson.

Furthermore, based on the totality of the circumstances, the court concludes that Defendant Tripodis "did not have an expectation of privacy [in the Acura] that society would recognize as legitimate." Samson, 126 S. Ct. at 2199.  And the State of Georgia has a substantial counterbalancing interest in taking the necessary measures, including conducting suspicionless searches of parolees, to reduce recidivism and assist in reintegration of parolees into society.  Id. at 2200.  Defendant's rights under the Fourth Amendment were not violated by the search of the vehicle he was operating on April 28, 2016.

On or about March 15-30, 2015, Defendant was released from prison and placed on parole.  (Tr. at 5, 74-76; Gov't Exhs. 1 and 2).  Defendant met with P.O. Thompson on March 30, 2015, to review, acknowledge, and execute the conditions and instructions governing his parole.  (Tr. at 75-77; Gov't Exh. 1).  One of the standard conditions of his parole, which Defendant was required to acknowledge and agree to in order to be released from prison and remain on parole, provided:  "My parole officer or any other parole officer may, at any time, conduct a warrantless search of my person, papers, and place of residence, automobile, or any other property under my

83

control."[31]  (Tr. at 76-77, 79; Gov't Ex. 1).  PO Thompson read verbatim the parole

certificate to Defendant, and explained to Defendant the acknowledgment and

certification portion of the parole certificate.  (Tr. at 77-79; Gov't Ex. 1).  As

witnessed by P.O. Thompson, Defendant signed the acknowledgment of conditions

of release which provided in part, "I have read or have had read to me the above

standard Parole conditions[.]"  (Tr. at 75-76, 79; Gov't Ex. 1).[32]  The P.O. testified that

_____

[31]This is the same condition that the Eleventh Circuit Court of Appeals in
United States v. Johnson, 579 Fed. Appx. 920 (11th Cir. 2014), and in United States
v. Stewart, 213 Fed. Appx. 898 (11th Cir. 2007), and the District Court in the Middle
District of Alabama in United States v. Brown, 2009 WL 112574 (M.D. Ala. January
15, 2009), applied to uphold a warrantless search of a Georgia parolee's residence
pursuant to Samson.

[32]The court does not find persuasive Defendant's contention that the parole
certificate executed on March 30, 2015, is not authentic. [Doc. 183 at 7]. Ignoring
all of the evidence introduced at the hearing, that is, that P.O. Thompson obtained the
parole certificate from the BOPP database, that her signature and initials - as well as
other notes - are on the form and that she witnessed Defendant sign the form (Tr. at
75-76, 79, 81, 83), Defendant relies on a nonsensical argument that the form signed
on March 30, 2015, "scanned" into the P.O.'s cell phone cannot be authentic because
it looks just like the form obtained from the prison database - also bearing Defendant's
signature. [Doc. 183 at 7]. And, contrary to Defendant's argument, the court does not
find P.O. Thompson's testimony to be inconsistent with P.O. Stanfield's testimony.
[Id.]. P.O. Stanfield, who no longer worked for BOPP at the time of the hearing and
could not access the BOPP database, relied on an unexecuted copy of the parole
certificate. (Tr. at 15-18, 39-41). And any disagreement between P.O. Stanfield's
recollection about the procedure for maintaining the forms and P.O. Thompson's is
easily reconciled by relying on the latter's testimony. P.O. Stanfield worked for BOPP
for approximately one year and a half, leaving several years ago. (Tr. at 4-5). P.O.

Defendant, who attended Emory for four years, was articulate, was not impaired and appeared to understand the conditions of his parole.  (Tr. at 78-79).  Defendant was advised of and was well-aware of the clearly stated conditions of his parolee.

Thereafter, on April 28, 2016, following Defendant's arrest for violations of his parole conditions, subject to the search provision, Defendant's supervising P.O. Stanfield and TFO Gibbs participated in a search of the Acura that Defendant drove to the parole office that day.[33]  (Tr. at 14-18; 49-50, 56-61).  The items seized from the vehicle were turned over to TFO Gibbs.  (Tr. at 19, 35).

Despite his awareness of and agreement to the standard condition of parole requiring him to submit to a warrantless search "at any time," Defendant argues that the scope of his "consent" to allow warrantless searches was exceeded and that reasonable suspicion was required to justify the search.  Given Defendant's execution of the parole certificate to allow warrantless and suspicionless searches as a condition

---

Thompson has ten years of experience, including being promoted to District Operations Manager and having been a training officer for other parole officers.  (Tr. at 73-74).

[33]Likewise, to the extent that P.O. Stanfield testified, contrary to P.O. Thompson's testimony that other law enforcement officers may assist with a parole search (Tr. at 85), that only she searched the Acura because she "was the only one with proper search powers[,]" (Tr. at 33-34), the court finds P.O. Thompson's testimony more reliable.

of his release on parole - in fact, required for Defendant to even be released on parole, the court finds that Defendant lacks a reasonable expectation of privacy to challenge the search of the Acura under the Fourth Amendment, irrespective of who assisted P.O. Stanfield with the search.  See Samson, 126 S. Ct. at 2199; Stewart, 213 Fed. Appx. at 899 ("Because Stewart's parole certificate required him to submit to a search 'at any time' without a warrant, the [warrantless and suspicionless] search was authorized by the terms of Stewart's parole conditions."); United States v. Wilcher, 2010 WL 5678676, at *4 (N.D. Ga. December 17, 2010) ("Under these circumstances, the conditions of Defendant's release so diminished his expectation of privacy, that even a suspicionless search does not violate the Fourth Amendment."), report and recommendation adopted by 2011 WL 336462 (N.D. Ga. February 1, 2011).

For this reason, as did the Supreme Court in Samson, this court declines to reach the issue of whether Defendant's execution of the standard conditions of parole constituted a waiver of - or a consent to waive - his Fourth Amendment rights.  126 S. Ct. at 2199 n.3.  This is simply not a situation where Defendant "consented" to a search under specific terms and conditions.  Defendant's argument, for which he offers no legal authority on point, that participation by other law enforcement officers invalidates a parole search, has been considered and rejected by other courts in this

86

circuit.  In <u>Wilcher</u>, the defendant argued that the parole search was invalid because other law enforcement officers assisted the parole officers in conducting the search. In that case, the defendant argued that the law enforcement officers exploited the parole condition to avoid obtaining a search warrant.  2010 WL 5678676, at *5.  The court stated, "Other law enforcement officers may participate in the search of a parolee's home by parole officers so long as the other law enforcement officers are acting under the direction of a parole officer and the parole officer is pursuing legitimate supervision objectives."  <u>Id.</u> ("'Police officers and parole officers are fungible when the former serve as mere implementers of decisions already made by the latter.'") (citation omitted); <u>and see</u> <u>United States v. Todd</u>, 2017 WL 1197849, **11-12 (S.D. Ga. February 10, 2017), <u>report and recommendation adopted by</u> 2017 WL 1172113 (S.D. Ga. March 29, 2017).[34]  The evidence in this case demonstrates

_____

[34]In fact, arguments about the motivations of the parole officers and other officers assisting them in carrying out a warrantless search based on a condition of parole are arguably not appropriate considerations.  In <u>United States v. Harris</u>, 635 Fed. Appx. 760 (11th Cir. 2015), the Eleventh Circuit Court of Appeals discussed and rejected the defendant's "stalking horse" argument based on the participation of other law enforcement officers in the search, that is, "that the government used the search provision in his terms of probation to circumvent the Fourth Amendment" because "the search of his residence had a law enforcement, rather than probationary, purpose." <u>Id.</u> at 766.  The court noted that neither the Supreme Court nor the Eleventh Circuit had ever recognized a "stalking horse" theory and that many circuits recognizing the theory had subsequently overruled those decisions following

that P.O. Stanfield made the decision to locate the Acura and conduct the search and that TFO Gibbs, who had not been aware that there might be a search of the Acura - or else he would have seized the keys to the Acura. (Tr. at 14-15, 18-19, 32-33, 48-49, 54-55, 57-58).

And, in light of the State's substantial interest in supervising parolees, under the totality of the circumstances, the search was reasonable under the Fourth Amendment. Samson, 126 S. Ct. at 2202. The court in Wilcher succinctly outlined the numerous restrictions and obligations placed on parolees in the State of Georgia through the conditions of supervision. 2010 WL 5678676, at *3. These conditions include requiring reporting as required to the supervising P.O., permission for travel, support of dependents, making reparations for crime, and obtaining, if lacking, a high school diploma; having a verifiable address and employment; and, as directed, attending various treatment and counseling sessions. Of course, included within these restrictions, is the warrantless search provision Id. The court also explained the

---

"Knights, which suggested that it is impermissible to examine the purpose of a probationary search." Harris, 635 Fed. Appx. at 766 (citing Knights, 122 S. Ct. at 593); and see Brown, 2009 WL 112574, at *4 (rejecting the defendant's argument that the involvement of other law enforcement officers rendered the search unlawful and finding, as in Harris, that "'stalking horse' claims are not viable in the probation and parole search context").

State's strong interest in ensuring compliance with these restrictions: "[T]he State of Georgia has a strong concern that a parolee will be more likely than an ordinary member of the community to engage in criminal conduct. . . .  Therefore, the State of Georgia's focus on parolees, more so than the average citizen, is justified because of its interest in protecting potential victims of criminal enterprise." Id., at *4.  The court also recognized a secondary "substantial interest in supervising parolees in order to reduce recidivism and promote reintegration."  Id.  Without offering any legal authority in support, Defendant argues that the State's interest is minimized by the fact he was already under arrest at the time the parole search occurred focusing solely on the State's interest of assisting parolees in reintegrating into society.  [Doc. 183 at 8].  However, the fact that the defendants in Wilcher, 2010 WL 5678676, at *2, and Brown, 2009 WL 112574, at **1-2, were under arrest at the time of the parole searches in question did not impact the courts' decisions in those cases, and the fact that Defendant Tripodis was under arrest does not alter the court's analysis in this case.

Therefore, the court finds that the items seized from the silver Acura are admissible in evidence.

89

## III.   Conclusion

For the foregoing reasons and cited authority, the court **RECOMMENDS** that Defendant's motion [Doc. 98] to suppress evidence be **DENIED**.

### Defendant Wilson's Motion for Severance

Pending before the court is Defendant Wilson's motion [Doc. 118] for severance for trial from Defendant Kakawana Tate pursuant to Bruton v. United States, 88 S. Ct. 1620 (1968).  The Government has advised the court that there is no opposition to the motion.  Accordingly, the court **RECOMMENDS** that Defendant's motion [Doc. 118] be **GRANTED**.

### Defendant Tripodis' Pro Se Filings

Also pending before the court are Defendant Tripodis' second series of *pro se* filings, motion [Doc. 187] to compel discovery, motion [Doc. 188] to dismiss Counts 6 and 7, and motion [Doc. 189] to dismiss Count 17.[35]  The court **RECOMMENDS** that the *pro se* motions be **DENIED** because they are both untimely and procedurally improper.  "Because Defendant is currently represented, the court will not consider his

---

[35]Defendant also sent to the court at least two letters, improperly *ex parte*, one of which is docketed [Doc. 185]; however, no direct communications from Defendant have been reviewed or will be considered by the court in ruling on Defendant's properly filed motions addressed *supra*.

AO 72A
(Rev.8/82)

*pro se* motions." United States v. Norris, 2011 WL 13193006, at *1 (N.D. Ga. March 8, 2011) (citing L.Crim.R. 57.1(D)(3), N.D. Ga.); and see United States v. Dale, 618 Fed. Appx. 494, 497-98 (11th Cir. 2015) (finding that the district court did not abuse its discretion in denying *pro se* motion filed by represented counsel construing Southern District of Florida local rule); United States v. Coleman, 2010 WL 11515338, at **2, 4 (N.D. Ga. May 18, 2010) (adopting report and recommendation that the defendant's *pro se* motions, filed while represented by counsel, be denied).

## Conclusion

For the foregoing reasons and based on the cited legal authority, the court **RECOMMENDS** that:

(1)    Defendant Tripodis' motion [Doc. 97] to dismiss Counts 2-11 and 14-16 be **DENIED**;

(2)    Defendant Tripodis' motion [Doc. 98] to suppress evidence be **DENIED**;

(3)    Defendant Tripodis' motion [Doc. 100] to dismiss Count 17 be **DENIED**;

(4)    Defendant Tripodis' motion [Doc. 101] to dismiss Counts 2-10 be **DENIED**;

(5)    Defendant Tripodis' motion [Doc. 104] to dismiss Counts 15 and 16 be **GRANTED** as unopposed;

AO 72A
(Rev.8/82)

(6)     Defendant Wilson's motion [Doc. 117] to suppress identification evidence be **DENIED**;

(7)     Defendant Wilson's motion [Doc. 118] for severance be **GRANTED** as unopposed;

(8)     Defendant Wilson's motion [Doc. 130] to dismiss Count 17 be **DENIED**;

(9)     Defendant Wilson's motion [Doc. 131] to dismiss Counts 2-10 be **DENIED**; and

(10)    Defendant Tripodis' *pro se* motions [Docs. 187, 188 and 189] be **DENIED**.

It is **ORDERED** that Defendant Tripodis' motion [Doc. 102] to strike surplusage be **DENIED** and motion [Doc. 103] for a bill of particulars be **GRANTED IN PART** and **DENIED IN PART** as set forth *supra*.

There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case.

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, declared Ready for Trial as to Defendants

**SO RECOMMENDED AND ORDERED** this 20th day of December, 2019.

JANET F. KING
UNITED STATES MAGISTRATE JUDGE

92